# SOUTH CAROLINA *v.* REGAN, SECRETARY OF THE TREASURY

No. 94, Orig.   Argued October 5, 1983—Decided February 22, 1984

BRENNAN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which BURGER, C. J., and WHITE, MARSHALL, and STEVENS, JJ., joined, and an opinion with respect to Part III, in which BURGER, C. J., and WHITE and MARSHALL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 382. O'CONNOR, J., filed an opinion concurring in the judgment, in which POWELL and REHNQUIST, JJ., joined, *post*, p. 384. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 403.

*Huger Sinkler* argued the cause for plaintiff. With him on the briefs were *Karen LeCraft Henderson, T. Travis*

*Medlock*, Attorney General of South Carolina, *C. Tolbert Goolsby, Jr.*, Chief Deputy Attorney General, and *David C. Eckstrom* and *Grady L. Patterson III*, Assistant Attorneys General.

*Susan Lee Voss*, Assistant Attorney General of Texas, argued the cause for the State of Texas et al. as *amici curiae.* With her on the brief were *Jim Mattox*, Attorney General of Texas, *David R. Richards*, Executive Assistant Attorney General, and *Robert T. Lewis* and *Michael Cafiso*, Assistant Attorneys General, and the Attorneys General for their respective States as follows: *Norman C. Gorsuch* of Alaska, *Robert K. Corbin* of Arizona, *Michael J. Bowers* of Georgia, *Linley E. Pearson* of Indiana, *Thomas J. Miller* of Iowa, *William J. Guste, Jr.*, of Louisiana, *Stephen H. Sachs* of Maryland, *William A. Allain* of Mississippi, *John D. Ashcroft* of Missouri, *Michael T. Greely* of Montana, *Brian McKay* of Nevada, *Gregory H. Smith* of New Hampshire, *Rufus L. Edmisten* of North Carolina, *Robert Wefald* of North Dakota, *Anthony Celebrezze* of Ohio, *Michael K. Turpin* of Oklahoma, *LeRoy S. Zimmerman* of Pennsylvania, *Dennis J. Roberts II* of Rhode Island, *William L. Leech, Jr.*, of Tennessee, *John J. Easton, Jr.*, of Vermont, *Gerald L. Baliles* of Virginia, *Bronson C. La Follette* of Wisconsin, and *Archie G. McClintock* of Wyoming.

*Deputy Solicitor General Claiborne* argued the cause for defendant. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Archer, Stuart A. Smith, Michael L. Paup*, and *Ernest J. Brown.**

---

*Briefs of *amici curiae* were filed for the City of Baltimore et al. by *Benjamin Brown, J. Lamar Shelley, John W. Witt, Roger F. Cutler, Roy D. Bates, George Agnost, Robert J. Alfton, Mark Aronchick, James K. Baker, James P. McGuire, Clifford D. Pierce, Jr., William H. Taube, William I. Thornton, Jr., Henry W. Underhill, Jr.*, and *Charles S. Rhyne;* and for the National Association of Counties et al. by *Lawrence R. Velvel* and *Dennis A. Dutterer.*

Justice Brennan delivered the opinion of the Court.[†]

South Carolina invokes the Court's original jurisdiction[1] and asks leave to file a complaint against Donald T. Regan, the Secretary of the Treasury of the United States. The State seeks an injunction and other relief, on the ground that § 103(j)(1) of the Internal Revenue Code of 1954, 26 U. S. C. § 103(j)(1) (1982 ed.), as added by § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97–248, 96 Stat. 596, is constitutionally invalid as violative of the Tenth Amendment and the doctrine of intergovernmental tax immunity.

The Secretary objects to the motion on the ground that the Anti-Injunction Act, 26 U. S. C. § 7421(a), bars this action[2] and, alternatively, that the Court should exercise its discretion to deny leave to file. We are not persuaded that either is a ground for denying the motion, and therefore grant the motion for leave to file the complaint.

## I

Section 103(a) of the Internal Revenue Code (IRC) exempts from a taxpayer's gross income the interest earned on the obligations of any State.[3] In 1982, however, as part of

---

[†]Part III of the opinion is joined only by The Chief Justice, Justice White, and Justice Marshall.

[1] U. S. Const., Art. III, § 2; 28 U. S. C. § 1251(b).

[2] Defendant also argues that the Court may not grant declaratory relief because the Declaratory Judgment Act, 28 U. S. C. § 2201 (1982 ed.), which authorizes "any court of the United States" to issue a declaratory judgment in an appropriate case, excepts from its coverage most actions "with respect to Federal taxes." Because of our disposition of the case, we need not decide at this time whether we may grant declaratory relief should plaintiff prevail on the merits.

[3] IRC § 103(a) provides in pertinent part:

"(a) General rule

"Gross income does not include interest on—

"(1) the obligations of a State, a Territory, or a possession of the United States, or any political subdivision of any of the foregoing, or of the District of Columbia . . . ."

TEFRA, Congress amended § 103 to restrict the types of bonds that qualify for the tax exemption granted by that section. Specifically, § 310(b)(1) of TEFRA added a new provision, § 103(j)(1), to the Code. Section 103(j)(1) requires that certain obligations, termed "registration-required obligation[s]," be issued in registered,[4] rather than bearer, form to qualify for the § 103(a) exemption.[5] For purposes of § 103 (j)(1), registration-required obligations are defined broadly to include most publicly issued obligations with maturities greater than one year.[6] If an obligation that is registration-required is issued in bearer, rather than registered, form, then § 103(j)(1) provides that the interest on that obligation is taxable.

Because the imposition of a tax on bearer bonds would require a State to pay its bondholders a higher rate of interest on such bonds, South Carolina argues that the practical effect of § 103(j)(1) is to require it to issue its obligations in registered form. For that reason, South Carolina argues that the

---

[4] Temporary Regulation § 5f.103–1 provides:

"An obligation is in registered form if —

"(i) The obligation is registered as to both principal and any stated interest and transfer of the obligation may be effected only by the surrender of the old instrument and either the reissuance by the issuer of the old instrument to the new holder or the issuance by the issuer of a new instrument to the new holder, or

"(ii) The right to the principal of, and stated interest on, the obligation may be transferred only through a book entry system (as described in paragraph (c)(2) of this section)." 26 CFR § 5f.103–1 (1983).

[5] Section 103(j)(1) provides as follows:

"(j) Obligations must be in registered form to be tax-exempt

"(1) In general

"Nothing in subsection (a) or in any other provision of law shall be construed to provide an exemption from Federal income tax for interest on any registration-required obligation unless the obligation is in registered form."

[6] Section 103(j)(2) defines a registration-required obligation as any obligation other than an obligation that "(A) is not of a type offered to the public, (B) has a maturity (at issue) of not more than 1 year, or (C) is described in section 163(f)(2)(B)."

section destroys its freedom to issue obligations in the form that it chooses.   Viewing its borrowing power as essential to the maintenance of its separate and independent existence, South Carolina contends that the condition imposed by § 103 (j)(1) on the exercise of that power violates the Tenth Amendment.   In addition, relying on *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429 (1895), South Carolina argues that Congress may not tax the interest earned on the obligations of a State.   Because § 103(j)(1) imposes a tax on the interest earned on state obligations issued in bearer form, the State argues that the section is unconstitutional.   Accordingly, South Carolina asks that its motion to file the complaint be granted and that this Court award declaratory, injunctive, and other appropriate relief.[7]

The Secretary does not address the merits of the State's constitutional claims.   Rather, he argues that we may not grant the motion to file because this action is barred by the Anti-Injunction Act.   The Act provides, in pertinent part, that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."[8]   Characterizing this action as a suit to "restrai[n] the assessment or collection of" a tax, the Secretary contends that this suit is barred by the statute. The Secretary argues that *Enochs* v. *Williams Packing & Navigation Co.*, 370 U. S. 1 (1962), establishes the single judicially created exception to the Act and that this action does not fall within that exception.   We need not address

---

[7] Since we have decided to appoint a Special Master to develop a factual record, see *infra*, at 382, we express no opinion on the merits of the State's claims.

[8] The full text of the Act reads:

"Except as provided in sections 6212(a) and (c), 6213(a), 6672(b), 6694(c), 7426(a) and (b) (1), and 7429(b), no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."   IRC § 7421(a).

None of the statutory exceptions is relevant in this case.

whether this case falls within the *Williams Packing* exception for we hold that the Act was not intended to bar an action where, as here, Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax.[9]

## II

When enacted in 1867, the forerunner of the current Anti-Injunction Act provided that "no suit for the purpose of restraining the assessment or collection of tax shall be maintained in any court." Act of Mar. 2, 1867, § 10, 14 Stat. 475.[10] Although the Act apparently has no recorded legislative history, *Bob Jones University* v. *Simon,* 416 U. S. 725, 736 (1974), the circumstances of its enactment strongly suggest that Congress intended the Act to bar a suit only in situations in which Congress had provided the aggrieved party with an alternative legal avenue by which to contest the legality of a particular tax.

The Act originated as an amendment to a statute that provided that

> "[n]o suit shall be maintained in any court for the recovery of any tax alleged to have been erroneously or illegally assessed or collected, until appeal shall have been duly made to the commissioner of internal revenue . . . and a decision of said commissioner shall be had thereon, unless such suit shall be brought within six months from the time of said decision . . . ." Internal Revenue Act of July 13, 1866, § 19, 14 Stat. 152.

The Anti-Injunction Act amended this statute by adding the prohibition against injunctions. Act of Mar. 2, 1867, § 10, 14

---

[9] Because of our disposition of the statutory issue, we need not reach the State's contention that application of the Act to bar this suit would unconstitutionally restrict this Court's original jurisdiction.

[10] In the revised statutes, the term "any" was added so that the statute read: "No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." *Snyder* v. *Marks,* 109 U. S. 189, 192 (1883). This language appears in the current version of the Act.

Stat. 475. The Act, therefore, prohibited injunctions in the context of a statutory scheme that provided an alternative remedy. As we explained in *Snyder* v. *Marks*, 109 U. S. 189, 193 (1883), "[t]he remedy of a suit to recover back the tax after it is paid is provided by statute, and a suit to restrain its collection is forbidden." This is cogent evidence that the 1867 amendment was merely intended to require taxpayers to litigate their claims in a designated proceeding.

The Secretary argues that, regardless of whether other remedies are available, a plaintiff may only sue to restrain the collection of taxes if it satisfies the narrow exception to the Act enunciated in *Williams Packing, supra*. *Williams Packing* did not, however, ever address, let alone decide, the question whether the Act applies when Congress has provided no alternative remedy. Indeed, as we shall see, a careful reading of *Williams Packing* and its progeny supports our conclusion that the Act was not intended to apply in the absence of such a remedy.

*Williams Packing* was a taxpayer's suit to enjoin the District Director of the Internal Revenue Service from collecting allegedly past-due social security and unemployment taxes. The Court concluded that the Anti-Injunction Act would not apply if the taxpayer (1) was certain to succeed on the merits, and (2) could demonstrate that collection would cause him irreparable harm. 370 U. S., at 6–7. Finding that the first condition had not been met, the Court concluded that the Act barred the suit. Significantly, however, Congress had provided the plaintiff in *Williams Packing* with the alternative remedy of a suit for a refund. *Id.*, at 7.

In each of this Court's subsequent cases that have applied the *Williams Packing* rule, the plaintiff had the option of paying the tax and bringing a suit for a refund. Moreover, these cases make clear that the Court in *Williams Packing* and its progeny did not intend to decide whether the Act would apply to an aggrieved party who could not bring a suit for a refund.

For example, in *Bob Jones*, *supra*, the taxpayer sought to prevent the Service from revoking its tax-exempt status under IRC § 501(c)(3). Because the suit would have restrained the collection of income taxes from the taxpayer and its contributors, as well as the collection of federal social security and unemployment taxes from the taxpayer, the Court concluded that the suit was an action to restrain "the assessment or collection of any tax" within the meaning of the Anti-Injunction Act. 416 U. S., at 738–739. Applying the *Williams Packing* test, the Court found that the Act barred the suit because the taxpayer failed to demonstrate that it was certain to succeed on the merits. 416 U. S., at 749. In rejecting the taxpayer's challenge to the Act on due process grounds, however, the Court relied on the availability of a refund suit, noting that "our conclusion might well be different" if the aggrieved party had no access to judicial review. *Id.*, at 746. Similarly, the Court left open the question whether the Due Process Clause would be satisfied if an organization had to rely on a "friendly donor" to obtain judicial review of the Service's revocation of its tax exemption. *Id.*, at 747, n. 21.[11]

In addition, in *Alexander* v. *"Americans United" Inc.*, 416 U. S. 752 (1974), decided the same day as *Bob Jones*, the Court considered a taxpayer's action to require the Service to reinstate its tax-exempt status.[12] The Court applied the *Williams Packing* test and held that the action was barred

---

[11] A "friendly donor" suit is a suit in which a donor claims that his contributions to an organization should be tax deductible because the organization's tax-exempt status had been revoked improperly.

[12] In *"Americans United,"* the IRS had revoked the organization's § 501(c)(3) status, but found that it was eligible for § 501(c)(4) status. Although the organization's income remained tax exempt, "[t]he effect of this change in status was to render respondent liable for unemployment (FUTA) taxes under Code § 3301, 26 U. S. C. § 3301, and to destroy its eligibility for tax deductible contributions under § 170." 416 U. S., at 755 (footnote omitted).

by the Act. Finally, in *United States* v. *American Friends Service Committee,* 419 U. S. 7 (1974) *(per curiam),* the taxpayers sought to enjoin the Government from requiring that a portion of their wages be withheld. The taxpayers argued that the withholding provisions violated their First Amendment right to bear witness to their religious beliefs. The Court again applied the *Williams Packing* rule and found that the suit was barred by the Anti-Injunction Act. In both of these cases, the taxpayers argued that the *Williams Packing* test was irrelevant and the Act inapplicable because they did not have adequate alternative remedies. In rejecting this argument, the Court expressly relied on the availability of refund suits. 416 U. S., at 761; 419 U. S., at 11. This emphasis on alternative remedies would have been irrelevant had the Court meant to decide that the Act applied in the absence of such remedies. We therefore turn to that question.

The analysis in *Williams Packing* and its progeny of the purposes of the Act provides significant support for our holding today. *Williams Packing* expressly stated that the Act was intended to protect tax revenues from judicial interference *"and to require that the legal right to the disputed sums be determined in a suit for refund."* 370 U. S., at 7 (emphasis added). Similarly, the Court concluded that the Act was also designed as "protection of the collector from litigation *pending a suit for refund,"* *id.,* at 7–8 (emphasis added). The Court's concerns with protecting the expeditious collection of revenue and protecting the collector from litigation were expressed in the context of a procedure that afforded the taxpayer the remedy of a refund suit.[13]

Nor is our conclusion inconsistent with the 1966 amendment to the Anti-Injunction Act. In 1966, in § 110(c) of the Federal Tax Lien Act, Pub. L. 89–719, 80 Stat. 1144, Congress amended the Anti-Injunction Act to read, in pertinent

---

[13] Unlike JUSTICE O'CONNOR, we do not believe that Congress' concerns with judicial interference overrode all other concerns. This case is difficult because it implicates Congress' concern with providing remedies as well as its concern with limiting remedies.

·part, that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." *Ibid.* The central focus of the added phrase, "by any person, whether or not such person is the person against whom such tax was assessed," was on third parties whose property rights competed with federal tax liens. *Bob Jones*, 416 U. S., at 732, n. 6. Prior to the adoption of the Tax Lien Act, such parties were often unable to protect their property interests. *Ibid.;* H. R. Rep. No. 1884, 89th Cong., 2d Sess., 27–28 (1966).[14] Section 110(a) of the Tax Lien Act gave such third parties a right of action against the United States.[15] The amendment to the Anti-Injunction Act was primarily designed to insure that the right of action granted by § 110(a) of the Federal Tax Lien Act was exclusive. 416 U. S., at 732, n. 6. The language added to the Anti-Injunction Act by the 1966 amendment is, therefore, largely irrelevant to the issue before us today.[16]

---

[14] Any dicta in *Bob Jones* suggesting that, prior to the enactment of the Tax Lien Act, the Anti-Injunction Act barred suits by third parties claiming that a federal tax lien impaired their property rights may be disregarded. 416 U. S., at 732, n. 6. The Anti-Injunction Act had been widely construed not to apply to such actions. See, *e. g., Campbell* v. *Bagley*, 276 F. 2d 28 (CA5 1960); *Tomlinson* v. *Smith*, 128 F. 2d 808 (CA7 1942); American Bar Association, Final Report of the Committee on Federal Liens, pp. 48, 116, reprinted in Hearings on H. R. 11256 and H. R. 11290 before the House Committee on Ways and Means, 89th Cong., 2d Sess., 125, 192 (1966).

[15] Section 110(a), codified at 26 U. S. C. § 7426, provides in pertinent part:

"If a levy has been made on property or property has been sold pursuant to a levy, and any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States."

[16] In *Bob Jones*, we held that the 1966 amendment did not merely limit the remedies of third parties challenging federal tax liens. Rather, the

In sum, the Anti-Injunction Act's purpose and the circumstances of its enactment indicate that Congress did not intend the Act to apply to actions brought by aggrieved parties for whom it has not provided an alternative remedy.[17]   In this

---

amendment was also intended as a reaffirmation of the plain language of the Act.   416 U. S., at 732, n. 6.   In that sense, we found the statute to be "declaratory" rather than "innovative."   *Ibid.*   Because the Act, as originally enacted, did not cover third parties who were not given an alternative action in which to press their claims, our construction of the 1966 amendment in *Bob Jones* is entirely consistent with our holding today.

Similarly, we stated in *"Americans United"* that "a suit to enjoin the assessment or collection of anyone's taxes triggers the literal terms" of the Act.   416 U. S., at 760.   Of course, this statement was meant to apply only if the aggrieved party has an alternative remedy.

JUSTICE O'CONNOR relies heavily on Assistant Treasury Secretary Surrey's statement to the House Ways and Means Committee to support her view that the 1966 amendment to the Anti-Injunction Act was intended to prohibit third parties from suing to restrain the collection of taxes regardless of whether Congress has provided them with an alternative remedy. *Post,* at 389–390.   This reliance is misplaced.

Although the Assistant Secretary described the amendment as a restriction on third-party suits, when read in context, it is unclear whether he was referring to all third parties, including those without alternative remedies, as JUSTICE O'CONNOR believes, or only to those third parties who were granted a right of action by § 110(a) of the Federal Tax Lien Act. See Statement by the Hon. Stanley S. Surrey, Assistant Secretary of the Treasury, reprinted in Hearings on H. R. 11256 and H. R. 11290, *supra,* at 58.

Even if Assistant Secretary Surrey viewed the 1966 amendment as prohibiting suits by third parties who had no alternative remedies, there is nothing in the legislative history of that amendment to support the view that Congress shared that belief.   JUSTICE O'CONNOR relies on the statements in the House and Senate Reports that " '[u]nder present law . . . the United States cannot be sued by third persons where its collection activities interfere with their property rights,' " *post,* at 389, quoting H. R. Rep. No. 1884, 89th Cong., 2d Sess., 27 (1966); S. Rep. No. 1708, 89th Cong., 2d Sess., 29 (1966).   Since the Anti-Injunction Act had been widely construed not to bar such suits, see n. 14, *supra,* however, this statement simply could not have been intended as a description of the effect of that Act.

[17] As the Secretary notes, IRC § 7478 does not provide plaintiff with an action in which it may contest the constitutionality of § 103(j)(1).   That sec-

case, if the plaintiff South Carolina issues bearer bonds, its bondholders will, by virtue of § 103(j)(1), be liable for the tax on the interest earned on those bonds. South Carolina will

tion permits the Tax Court to "make a declaration whether . . . prospective obligations are *described* in § 103(a)." The issue in this case involves the constitutionality of § 103(j)(1), not whether the bonds that the State desires to issue are "described in section 103." Therefore, § 7478 does not provide the State with an alternative procedure to contest the legality of § 103(j)(1).

JUSTICE O'CONNOR relies on statements in the legislative history of IRC § 7478 indicating that Congress believed that, prior to the enactment of that section, prospective issuers of state and local bonds had no means to determine whether the interest on their bonds would be tax exempt. *Post*, at 391–392. In her view, these statements are strong evidence that Congress intended the Anti-Injunction Act to apply regardless of the availability of an alternative remedy.

We find these statements unpersuasive. To the extent that these statements, which do not even refer to the Anti-Injunction Act, may be read as expressing the view that the Act should be construed to bar suits regardless of the availability of alternative remedies, they are the views of a subsequent Congress and, therefore, at best, " 'form a hazardous basis for inferring the intent of an earlier one.' " *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 117 (1980), quoting *United States* v. *Price*, 361 U. S. 304, 313 (1960).

JUSTICE O'CONNOR, relying on *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969), and *FHA* v. *The Darlington, Inc.*, 358 U. S. 84, 90 (1958), argues that these statements should be given " 'great weight' " in construing the Anti-Injunction Act. This reliance is misplaced. In *Red Lion* we stated that "[s]ubsequent *legislation* declaring the intent of an earlier statute is entitled to great weight." 395 U. S., at 380 (emphasis added). *The Darlington* stands for the same proposition. We have previously rejected the argument that the *Red Lion* rule should be applicable to the Committee Reports that accompany subsequent legislation. In *Consumer Product Safety Comm'n, supra*, at 118, n. 13, we stated: "With respect to subsequent *legislation* . . . Congress has proceeded formally through the legislative process. A mere statement in a conference report of such legislation as to what the Committee believes an earlier statute meant is obviously less weighty."

Indeed, JUSTICE O'CONNOR does not consistently accord "great weight" to the legislative history of § 7478. In Part I of her opinion, she states that the legislative history of § 7478 represents Congress' "belief that the Tax

incur no tax liability.  Under these circumstances, the State will be unable to utilize any statutory procedure to contest the constitutionality of § 103(j)(1).  Accordingly, the Act cannot bar this action.

The Secretary suggests that the State may obtain judicial review of its claims by issuing bearer bonds and urging a purchaser of those bonds to bring a suit contesting the legality of § 103(j)(1).  But the nature of this proposed remedy only buttresses our conclusion that the Act was not intended to apply to this kind of action.  First, instances in which a third party may raise the constitutional rights of another are the exception rather than the rule.  *Singleton* v. *Wulff*, 428 U. S. 106, 114 (1976).  More important, to make use of this remedy the State "must first be able to find [an individual] willing to subject himself to the rigors of litigation against the Service, and then must rely on [him] to present the relevant arguments on [its] behalf."  *Bob Jones*, 416 U. S., at 747, n. 21.  Because it is by no means certain that the State would be able to convince a taxpayer to raise its claims,[18] reliance on the remedy suggested by the Secretary would create

---

Anti-Injunction Act generally bars nontaxpayers from bringing the kind of injunctive action the State of South Carolina asks leave to file today." *Post*, at 392.  Under this view, the statement in the Senate Report accompanying § 7478 that "present law does not allow the State . . . government to go to court," S. Rep. No. 95–1263, p. 150 (1978), must mean that Congress believed that the Anti-Injunction Act barred original actions in this Court as well as actions in lower courts.  Yet, in reaching her conclusion that the Act does not apply to bar original actions in this Court, JUSTICE O'CONNOR apparently accords no weight at all to this legislative history.  *Post*, at 399.

For similar reasons, we find the remaining postenactment history upon which JUSTICE O'CONNOR relies, *post*, at 390–391, to be unconvincing.  Whatever the weight to which these statements are entitled, they are ultimately unpersuasive in light of the other evidence of congressional intent discussed above.

[18] It is not irrelevant that the IRS routinely audits the returns of taxpayers who litigate claims for refunds.  U. S. Dept. of Treasury, Chief Counsel's Directives Manual (35)(17)50 (1982).

the risk that the Anti-Injunction Act would entirely deprive the State of any opportunity to obtain review of its claims. For these reasons, we should not lightly attribute to Congress an intent to require plaintiff to find a third party to contest its claims. Here, the indicia of congressional intent—the Act's purposes and the circumstances of its enactment—demonstrate that Congress did not intend the Act to apply where an aggrieved party would be required to depend on the mere possibility of persuading a third party to assert his claims. Rather, the Act was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf.[19] Because Congress did not prescribe an alternative remedy for the plaintiff in this case, the Act does not bar this suit.

## III

The Secretary argues that if we conclude that the Anti-Injunction Act is not a bar to this suit, we should in any event exercise our discretion to deny leave to file. He notes that the Court's jurisdiction over this suit is not exclusive and that the Court exercises its "original jurisdiction sparingly and [is] particularly reluctant to take jurisdiction of a suit where the

---

[19] JUSTICE O'CONNOR suggests that our holding today will enable taxpayers to evade the Anti-Injunction Act by forming organizations to litigate their tax claims. *Post*, at 386, 394. We disagree. Because taxpayers have alternative remedies, it would elevate form over substance to treat such organizations as if they did not possess alternative remedies. Accordingly, such organizations could not successfully argue that the Act does not apply because they are without alternative remedies.

JUSTICE O'CONNOR also appears to suggest that our holding today renders the Act a restatement of the equitable principles governing the issuance of injunctions at the time the statute was enacted. *Post*, at 388, n. 5. This argument is without merit since these equitable principles did not require that injunctions issue only when no alternative remedy was available. See, *e. g., Dows* v. *Chicago*, 11 Wall. 108, 109–110 (1871) (suit to restrain collection of taxes will lie if plaintiff shows that enforcement will cause irreparable harm or lead to a multiplicity of suits); *Hannewinkle* v. *Georgetown*, 15 Wall. 547, 548–549 (1873) (same).

plaintiff has another adequate forum in which to settle his claim." *United States* v. *Nevada*, 412 U. S. 534, 538 (1973) *(per curiam)*. The State has, however, alleged that the application of § 103(j)(1) will "materially interfere with and infringe upon the authority of South Carolina to borrow funds." Motion for Leave to File Complaint 16; see *supra*, at 371–372. Additionally, 24 States have jointly submitted an *amicus* brief urging this Court to grant the motion to file. Unquestionably, the manner in which a State may exercise its borrowing power is a question that is of vital importance to all 50 States. Under these circumstances, we believe that it is appropriate for us to exercise our discretion in favor of hearing this case. At present, however, the record is not sufficiently developed to permit us to address the merits. We shall therefore appoint a Special Master to develop the record.

Accordingly, plaintiff's motion for leave to file a complaint is granted and a Special Master will be appointed.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in the judgment.

I, too, agree with all those who have written opinions in this case that the Anti-Injunction Act, 26 U. S. C. § 7421(a), is no bar to the ability of the State of South Carolina to invoke the original jurisdiction of this Court in order to challenge the validity of a federal tax statute. Like JUSTICE O'CONNOR, I have reservations about the breadth of the approach taken by JUSTICE BRENNAN in determining that Congress did not intend the Act to apply in any case in which the aggrieved party has no alternative avenue by which to contest the legality of a particular tax.

In *Bob Jones University* v. *Simon*, 416 U. S. 725 (1974), the Court stressed the broad sweep of the Anti-Injunction Act. The Court noted that the language added in 1966, prohibiting any suit for the purpose of restraining the assessment or collection of any tax "by any person, whether or not such person is the person against whom such tax was assessed," see § 110(c) of the Federal Tax Lien Act of 1966,

Pub. L. 89–719, 80 Stat. 1144, was intended as a "reaffirmation of the plain meaning" of the Act as it had stood since 1867. See 416 U. S., at 731–732, n. 6. See also *Alexander* v. *"Americans United" Inc.*, 416 U. S. 752, 760, n. 11 (1974). The Court in *Bob Jones* rejected the petitioner's efforts to rely on exceptions to the reach of the Act suggested in the 1930's for situations in which there is no adequate remedy short of a suit to enjoin the challenged tax. See 416 U. S., at 744. Because it concluded that the plaintiffs in *Bob Jones* and *"Americans United"* had access to judicial forums in which to challenge the alleged deprivations of their property, the Court did not need to decide whether and under what circumstances its broad reading of the Anti-Injunction Act might deny an aggrieved party due process of law. 416 U. S., at 746.

Unlike JUSTICE O'CONNOR, I see no need to decide whether Congress intended the Anti-Injunction Act to apply to suits invoking this Court's original jurisdiction. I would decide this case on the narrower ground set forth in my dissenting opinion in *"Americans United,"* 416 U. S., at 763. I there expressed concern that the Court was overlooking a necessary first step in applying the Anti-Injunction Act, that is, the determination whether the litigation is a "'suit for the purpose of restraining'" any tax. *Id.*, at 767, quoting 26 U. S. C. § 7421(a). Here, as in *"Americans United,"* there can be no serious argument that the disposition of South Carolina's claim will have much effect, if any at all, upon federal tax revenues. If South Carolina loses, it will register its securities.* If it wins, it will continue to issue unregistered

---

*According to the affidavit of the Treasurer of South Carolina, the issuance of registered bonds will increase South Carolina's interest costs by 0.25%. If the State were to continue to issue unregistered bonds, in the face of a ruling that § 103(j)(1) is valid, it estimates that it would have to pay between 3% and 5% more interest on its bonds to render them marketable. Counsel for South Carolina acknowledged at oral argument that since the effective date of § 103(j)(1) the State has issued fully registered bonds. Tr. of Oral Arg. 11.

securities. In either event, the Federal Government will receive no more tax revenues from purchasers of such securities than it has enjoyed since *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, was decided in 1895.

The acknowledged purpose of Congress in enacting § 310 (b)(1) of TEFRA in 1982 so as to add a new § 103(j) to the Internal Revenue Code of 1954 was to encourage the States to issue securities in registered form. See Staff of Joint Committee on Taxation, General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, 97th Cong., 2d Sess., 190 (Comm. Print 1982). In a case such as this, where it is evident that the challenged governmental action is one to "accomplish a broad-based policy objective" rather than to produce revenue, see *"Americans United,"* 416 U. S., at 771 (dissenting opinion), and the disposition of the challenge will have no effect on federal revenues, I conclude that the suit is not one "for the purpose of restraining the assessment or collection of any tax," within the words of § 7421(a).

Although I would not hold the Anti-Injunction Act to be a bar to South Carolina's ability to bring this suit in another court, I agree that we should hear this case. Exercise of our original jurisdiction is discretionary and, though the Court has exercised it sparingly, we are not prohibited from doing so by the fact that the original party may have an alternative forum. See *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 465 (1945). The issue presented is a substantial one, and is of concern to a number of States. I am satisfied that prompt resolution of the issue here will benefit all concerned and that the decision to grant leave to file is a proper exercise of our discretion.

JUSTICE O'CONNOR, with whom JUSTICE POWELL, and JUSTICE REHNQUIST join, concurring in the judgment.

The motion of South Carolina for leave to file a complaint in our original jurisdiction raises three questions. First, the Court must decide whether Congress intended by the

Tax Anti-Injunction Act, 26 U. S. C. § 7421(a), to bar non-taxpayers like the State of South Carolina from challenging the validity of federal tax statutes in the courts. Second, if the Act generally does bar such nontaxpayer suits, the Court must decide whether Congress intended, and if so whether the Constitution permits it, to bar us from considering South Carolina's complaint in our original jurisdiction. Third, if Congress either did not intend or constitutionally is not permitted to withdraw this case from our original jurisdiction, the Court must decide whether South Carolina's challenge to the constitutionality of § 103(j)(1) of the Internal Revenue Code of 1954, 26 U. S. C. § 103(j)(1) (1982 ed.), as added by § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97–248, 96 Stat. 596, raises issues appropriate for original adjudication.

In answering the first question, the Court reaches the unwarranted conclusion that the Tax Anti-Injunction Act proscribes only those suits in which the complaining party, usually a taxpayer, can challenge the validity of a taxing measure in an alternative forum. The Court holds that suits by nontaxpayers generally are not barred. In my opinion, the Court's interpretation fundamentally misconstrues the congressional anti-injunction policy. Accordingly, I cannot join its opinion.

I

A

The Tax Anti-Injunction Act provides, in pertinent part, that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U. S. C. § 7421(a). The Act's language "could scarcely be more explicit" in prohibiting nontaxpayer suits like this one, *Bob Jones University* v. *Simon*, 416 U. S. 725, 736 (1974), since the suit indisputably would have the purpose and effect of restraining taxes. See *id.*, at 738–742. The Act plainly bars not only "a taxpayer's

attempt to enjoin the collection of his own taxes, . . ." but also "a suit to enjoin the assessment or collection of anyon[e] [else's] taxes . . . ." *Alexander* v. *"Americans United" Inc.*, 416 U. S. 752, 760 (1974). Though the Internal Revenue Code (Code) contains a few exceptions to this nearly complete ban,[1] for the most part Congress has restricted the judicial role to resolution of concrete disputes over specific sums of money, either by way of a deficiency proceeding in the Tax Court, see 26 U. S. C. §§ 6212, 6213, or by way of a taxpayer's suit for refund, see 26 U. S. C. §§ 6532, 7422.

In depriving courts of jurisdiction to resolve abstract tax controversies, Congress has determined that the United States must be able "to assess and collect taxes alleged to be due without judicial intervention . . . ." *Enochs* v. *Williams Packing & Navigation Co.*, 370 U. S. 1, 7 (1962). "[T]axes are the life-blood of government," *Bull* v. *United States*, 295 U. S. 247, 259 (1935), and the anti-injunction prohibition is Congress' recognition that "the tenacity of the American taxpayer" constantly threatens to drain the Nation of a life-sustaining infusion of revenues. See Gorovitz, Federal Tax Injunctions and the Standard Nut Cases, 10 Taxes 446, 446 (1932). The Act's proscription literally extends to nontaxpayer as well as taxpayer suits, if only to prevent taxpayers from sidestepping the anti-injunction policy by bringing suit through nontaxpaying associations of taxpayers.[2]

---

[1] See *infra*, at 390–392 (describing some exceptions); see also 26 U. S. C. §§ 6694(c), 7429(b).

[2] Nontaxpaying associations of taxpayers and nontaxpayer organizations previously have attempted to avoid the congressional policy against judicial resolution of abstract tax controversies. See, *e. g.*, *Investment Annuity, Inc.* v. *Blumenthal*, 197 U. S. App. D. C. 235, 609 F. 2d 1 (1979) (insurers seeking declaration that certain investment annuity contracts are eligible for favorable tax treatment); *Educo, Inc.* v. *Alexander*, 557 F. 2d 617 (CA7 1977) (company engaged in designing and administering educational benefit plans for corporate employees sues to protect its clients' tax benefits); *Cattle Feeders Tax Committee* v. *Shultz*, 504 F. 2d 462 (CA10 1974) (unincorporated association representing participants in tax shelter cattle feed program seeking injunction to prevent Treasury from disallowing certain

Moreover, by broadly precluding both taxpayer and nontaxpayer suits, the Act serves a collateral objective of protecting "the collector from litigation pending a suit for refund." *Enochs* v. *Williams Packing & Navigation Co., supra,* at 7–8. The tax collector is an attractive target for all kinds of litigation, see, *e. g., Simon* v. *Eastern Kentucky Welfare Rights Organization,* 426 U. S. 26 (1976), and the Act ensures that only Congress and the Treasury, not a host of private plaintiffs, will determine the focus of the collector's energies.

## B

The Act's history expressly reflects the congressional desire that all injunctive suits against the tax collector be prohibited. First enacted in 1867,[3] it apparently was designed to protect the federal tax system from being inundated with the same type of injunctive suits that were then sweeping over the state tax systems. See *State Railroad Tax Cases,* 92 U. S. 575, 613 (1876); *Snyder* v. *Marks,* 109 U. S. 189, 193–194 (1883). There is little contemporaneous documentation,[4] but this Court's decisions indicate that the 39th Congress acted with a

> ". . . sense of . . . the evils to be feared if courts of justice could, in any case, interfere with the process of collect-

---

year-end deductions); *McGlotten* v. *Connally,* 338 F. Supp. 448, 453, n. 25 (DC 1972) (nontaxpayer challenge to tax-exempt status of racially discriminatory fraternal organization), disapproved in *Bob Jones University* v. *Simon,* 416 U. S. 725, 732, and n. 6 (1974).

[3] See Act of Mar. 2, 1867, § 10, 14 Stat. 475.

[4] The Act was introduced on March 1, 1867, by Senator Fessenden, Chairman of the Senate Committee on Finance, as an amendment to a section which made a taxpayer appeal to the Commissioner of Internal Revenue a condition precedent to suit for the recovery of taxes. See Cong. Globe, 39th Cong., 2d Sess., 1933 (1867) (proposing amendment to the Act of July 13, 1866, ch. 184, § 19, 14 Stat. 152, presently codified at 26 U. S. C. § 6532(a)). The House initially objected to this amendment, see Cong. Globe, *supra,* at 1949, but the Senate would not recede, *id.,* at 1950. After a conference, the House agreed to the amendment. See *id.,* at 1968. No other recorded legislative history has been uncovered. See Note, En-

ing the taxes on which the government depends for its continued existence." *State Railroad Tax Cases, supra,* at 613.

The experience in the States demonstrated the grave dangers which accompany intrusion of the injunctive power of the courts into the administration of the revenue:

"If there existed in the courts . . . any general power of impeding or controlling the collection of taxes, or relieving the hardship incident to taxation, the very existence of the government might be placed in the power of a hostile judiciary." *Cheatham v. United States,* 92 U. S. 85, 89 (1876).

To avoid these evils and to safeguard the federal tax system, the 39th Congress committed administration of the Code to the discretion of the Secretary of the Treasury.[5]

This broad anti-injunction ban remained essentially untouched for almost a century.[6] In 1966, however, Congress

---

joining the Assessment and Collection of Federal Taxes Despite Statutory Prohibition, 49 Harv. L. Rev. 109, and n. 9 (1935).

[5] The circumstances of the enactment do not, as the Court suggests, see *ante,* at 373–374, indicate that Congress meant to prohibit injunctions only where the statutory scheme provided an alternative remedy. Rather, "[s]ince equitable principles militating against the issuance of federal injunctions in tax cases existed independently of the Anti-Injunction Act, it is most unlikely that Congress would have chosen the stringent language of the Act if its purpose was merely to restate existing law and not to compel litigants to make use solely of the avenues of review opened by Congress." *Bob Jones University v. Simon,* 416 U. S. 725, 743, n. 16 (1974). "'Enacted in 1867, [the Anti-Injunction Act], for more than sixty years, [was] consistently applied as precluding relief, whatever the equities alleged.'" *Id.,* at 744, n. 18 (quoting *Miller v. Standard Nut Margarine Co.,* 284 U. S. 498, 511 (1932) (Stone, J., dissenting)).

[6] In the revised statutes, the term "any" was added so that the statute read: "No suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." *Snyder v. Marks,* 109 U. S. 189, 192 (1883).

took steps to "reaffir[m] the plain meaning of the original language of the Act." *Alexander* v. *"Americans United" Inc.*, 416 U. S., at 760, and n. 11. In § 110(c) of the Federal Tax Lien Act, Pub. L. 89–719, 80 Stat. 1144, Congress amended the Act to emphasize that no injunctive action *"by any person, whether or not such person is the person against whom such tax was assessed"* could be maintained in the courts. *Ibid.* (emphasis added). The Treasury Department proposed the 1966 amendment, and its principal spokesperson, Assistant Secretary Surrey, testified:

> "Subsection (c) of section 110 of the bill amends section 7421(a) of the code. That section presently prohibits injunctions against the assessment or collection of tax. The cases decided under this provision raise a question as to whether this prohibition applies against actions by persons other than the taxpayer. New section 7426 will specifically allow actions by third parties to enjoin the enforcement of a levy or sale of property. The amendment to section 7421 makes clear that third parties may bring injunction suits only under the circumstances provided in new section 7426(b)(1) of the code." Statement by the Hon. Stanley S. Surrey, Assistant Secretary of the Treasury, reprinted in Hearings on H. R. 11256 and H. R. 11290, before the House Committee on Ways and Means, 89th Cong., 2d Sess., 58 (1966).

The House Committee on Ways and Means and the Senate Committee on Finance apparently shared Mr. Surrey's understanding of the rights of nontaxpayers under prior law, for their Reports both state:

> "Under present law, . . . the United States cannot be sued by third persons where its collection activities interfere with their property rights. This includes cases where the Government wrongfully levies on one person's property in attempting to collect from a taxpayer. However, some courts allow suits to be brought against

district directors of Internal Revenue where this occurs." H. R. Rep. No. 1884, 89th Cong., 2d Sess., 27 (1966); S. Rep. No. 1708, 89th Cong., 2d Sess., 29 (1966).

To accommodate these conflicting rights, both Committees recommended that Congress enact § 7426, allowing "persons other than taxpayers" to bring suits against the United States to protect pre-existing liens on property levied upon by the Treasury, and amend § 7421(a) to forbid suits by all third persons, excepting those within the ambit of new § 7426. Congress followed the Committees' recommendations, on the understanding that the new language in § 7421(a) was "declaratory, not innovative." *Bob Jones University* v. *Simon*, 416 U. S., at 731–732, n. 6.[7]

Congress has since relaxed the statutory proscription against third-party suits on several occasions. For example, in 1974, it provided that certain designated persons could obtain declaratory judgments in the Tax Court with respect to the tax status of pension plans. See 26 U. S. C. § 7476. Similarly, in 1976, because "[u]nder [prevailing] law no court review of [Internal Revenue Service] ruling[s] [was] available," H. R. Conf. Rep. No. 94–1515, p. 463 (1976), Congress provided declaratory judgment procedures for determining the tax status of charitable organizations and of certain property transfers. See 26 U. S. C. §§ 7428, 7477; see also H. R. Conf. Rep. No. 94–1515, *supra*, at 523–524 ("Under present

---

[7] I am at a complete loss to understand the Court's assertion that the "language added to the Anti-Injunction Act by the 1966 amendment is . . . largely irrelevant to the issue before us today." *Ante*, at 377. This conclusion follows only if the Court begins with a premise that it need pay no attention to either the 1966 amendment's language or its legislative history.

Similarly, I do not believe, as the Court apparently does, see *ante*, at 377, n. 14, 377–378, n. 16, that statements in *Bob Jones University* v. *Simon*, *supra*, to the effect that the Act bars third-party suits, can or should be "disregarded." Those statements were made after studious interpretation of both the original Act and its 1966 amendment. They reflect what I believe is the only faithful reading of the statute's language and history.

law, the Tax Court can hear declaratory judgment suits only on the tax status of employee retirement plans. In no other case may an individual or an organization seek a declaratory judgment as to an organization's tax-exempt status"). Finally, in 1978, in 26 U. S. C. § 7478 (1982 ed.), Congress provided a mechanism whereby state or local governments could seek declaratory judgments as to the tax status of proposed municipal bond issuances.[8] The relevant Senate Report noted:

"As a practical matter, there is no effective appeal from a Service private letter ruling (or failure to issue a private letter ruling) that a proposed issue of municipal bonds is taxable. In those cases, although there may be a real controversy between a State or local government and the Service, present law does not allow the State or local government to go to court. The controversy can be resolved only if the bonds are issued, a bondholder excludes interest on the bonds from income, the exclusion is disallowed, and the Service asserts a deficiency in its statutory notice of deficiency. This uncertainty coupled with the threat of the ultimate loss of the exclusion, invariably makes it impossible to market the bonds. In addition, it is impossible for a State or local government to question the Service rulings and regulations directly.

"[S]tate and local government[s] should have a right to court adjudication in the situation described above. The bill deals with the problem by providing . . . for a declaratory judgment as to the tax status of a pro-

---

[8] Section 7478 does not directly apply to this case because it permits the Tax Court only to "make a declaration whether . . . prospective obligations are described in section 103(a)." The issue in this case involves the constitutionality of § 103(j)(1), not whether the bonds South Carolina desires to issue are "described in section 103(a)." Nevertheless, § 7478 demonstrates that Congress believed that, prior to the enactment of that section, prospective issuers had no means to determine whether the interest on their bonds would be tax exempt. See S. Rep. No. 95–1263, pp. 150–151 (1978).

posed issue of municipal bonds." S. Rep. No. 95–1263, pp. 150–151 (1978).

The Conference Report reflects a similar view of prevailing law. See H. R. Conf. Rep. No. 95–1800, p. 240 (1978). Thus, in 1974, 1976, and again in 1978, Congress expressed its belief that the Tax Anti-Injunction Act generally bars nontaxpayers from bringing the kind of injunctive action the State of South Carolina asks leave to file today.[9]

These subsequently *enacted* provisions and the legislative understanding of them are entitled to "great weight" in construing earlier, related legislation. See, *e. g.*, *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 380–381 (1969); *FHA* v. *The Darlington, Inc.*, 358 U. S. 84, 90 (1958). Combined with the legislative purposes obviously motivating the 39th and 89th Congresses, these provisions conclusively demonstrate that, absent express exemption, the Act generally precludes judicial resolution of all abstract tax controversies, even if the complaining parties would have no other forum in which to bring their challenges.

## C

The Court drew these same conclusions in *Bob Jones University* v. *Simon.* See 416 U. S., at 736–746. In that case, the Court rejected a private institution's request that an additional exception beyond the one created in *Enochs* v. *Williams Packing & Navigation Co.*, 370 U. S. 1 (1962) (equity court may issue injunction where it is clear that under no cir-

---

[9] Our cases make clear that the constitutional nature of a challenge to a tax, as distinct from its probability of success, is of no consequence under the Anti-Injunction Act. See *Alexander* v. *"Americans United" Inc.*, 416 U. S., at 759; *Bailey* v. *George*, 259 U. S. 16, 20 (1922); *Dodge* v. *Osborn*, 240 U. S. 118, 121 (1916). Congress can be presumed to have had knowledge of those cases when it amended the Act in 1966 and in later years when it passed related legislation. See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 382, and n. 66 (1982); *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978).

cumstances could the Government prevail), be carved out of the Act.[10]   The Court responded that *Williams Packing*

> "was meant to be the capstone to judicial construction of the Act.   It spells an end to a cyclical pattern of allegiance to the plain meaning of the Act, followed by periods of uncertainty caused by a judicial departure from that meaning, and followed in turn by the Court's rediscovery of the Act's purpose."   416 U. S., at 742.

*Bob Jones University* then reaffirmed that, except where a litigant can show both that the Government would "under no circumstances . . . prevail" and that equity jurisdiction is otherwise present, the Act would be given its "literal effect." *Id.*, at 737, 742–745.

Because the plaintiffs in *Bob Jones University* were assured ultimately of having access to a judicial forum, the Court did not definitively resolve whether Congress could bar a tax suit in which the complaining party would be denied all access to judicial review.   See *id.*, at 746.   But the Court's reference to "a case in which an aggrieved party has no access at all to judicial review" came in the context of its discussion of the taxpayer's claim that postponement of its challenge to the revocation of its tax-exempt status would violate due process.   *Bob Jones University*'s dictum, therefore, should be interpreted only as reflecting the established rule that Congress cannot, consistently with due process, deny a taxpayer with property rights at stake all opportunity for an ultimate judicial determination of the legality of a tax assessment against him.   See *Phillips* v. *Commissioner*, 283 U. S. 589, 596–597 (1931).

---

[10] The *Williams Packing* exception is not applicable in this case. Though South Carolina's Tenth Amendment and intergovernmental tax immunity claims are serious ones, we cannot say that there are no circumstances under which the Government could prevail.   Thus, even if § 103(j)(1) would cause the State irreparable injury, South Carolina could not rely on the *Williams Packing* exception to invoke a court's authority to review.

On this reading, *Bob Jones University*'s recognition that the complete inaccessability of judicial review might implicate due process concerns provides absolutely no basis for crafting an exception in this case. The State of South Carolina is not a "person" within the meaning of the Due Process Clause. See *South Carolina* v. *Katzenbach*, 383 U. S. 301, 323–324 (1966). Nor does the State assert a right cognizable as a "property" interest protected by that Clause. See generally *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 430–433 (1982) (cataloging cases). Therefore, it has no due process right to review of its claim in a judicial forum.[11]

In holding that the Act does not bar suits by nontaxpayers with no other remedies, the Court today has created a "breach in the general scheme of taxation [that] gives an opening for the disorganization of the whole plan . . . ." *Allen* v. *Regents of University System of Ga.*, 304 U. S. 439, 454 (1938) (Reed, J., concurring in result). Nontaxpaying associations of taxpayers, and most other nontaxpayers, will now be allowed to sidestep Congress' policy against judicial resolution of abstract tax controversies. They can now challenge both Congress' tax statutes and the Internal Revenue Service's regulations, Revenue Rulings, and private letter decisions. In doing so, they can impede

---

[11] Taxing measures inevitably have a pecuniary impact on nontaxpayers who are linked to the persons against whom a tax is imposed. This Court has held that the indirect impacts of a tax, no matter how detrimental, generally do not invade any interest cognizable under the Due Process Clause. See, *e. g.*, *Bob Jones University* v. *Simon* (indirect impact on charitable organization); *United States* v. *American Friends Service Committee*, 419 U. S. 7 (1974) *(per curiam)* (indirect impact on First Amendment interests of employees). There is no occasion here to address when, if ever, such indirect impacts would implicate due process concerns if no judicial review of the complaining party's direct tax liabilities would ultimately be available. Cf. *Bob Jones University* v. *Simon*, 416 U. S., at 747–748 (discussing powerful governmental interests); *Investment Annuity, Inc.* v. *Blumenthal*, 197 U. S. App. D. C., at 242–245, 609 F. 2d, at 7–10 (indirect impact on nontaxpaying business does not implicate Due Process Clause even though no judicial review otherwise available).

the process of collecting federal revenues and require Treasury to focus its energies on questions deemed important not by it or Congress but by a host of private plaintiffs. The Court's holding travels "a long way down the road to the emasculation of the Anti-Injunction Act, and down the companion pathway that leads to the blunting of the strict requirements of *Williams Packing* . . . ." *Commissioner* v. *Shapiro*, 424 U. S. 614, 635 (1976) (BLACKMUN, J., dissenting). I simply cannot join such a fundamental undermining of the congressional purpose.

## II

The Act's language, purpose, and history should leave no doubt that Congress intended to preclude both taxpayer and nontaxpayer suits, regardless of the availability of an alternative forum. The Solicitor General agrees and contends that, since the anti-injunction prohibition extends to "any court," it should be read to bar this Court from acting in its original jurisdiction as well. The Solicitor General's contention raises a grave constitutional question: namely, whether Congress constitutionally can impose remedial limitations so jurisdictional in nature that they effectively withdraw the original jurisdiction of this Court.

## A

Under the language used in Art. III of the Constitution, Congress relates to the courts of the United States in three textually different ways.[12] In its broadest textual delegation,

---

[12] Article III provides, in pertinent part:

"Section. 1. The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. . . .

"Section. 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls; . . . —to Controversies . . . between a State and Citizens of another State . . . .

that Article authorizes Congress to establish the "inferior Courts" and places no express limits on the congressional power to regulate the courts so created. See U. S. Const., Art. III, § 1, cl. 1. By contrast, that Article itself creates the Supreme Court and textually differentiates between Congress' relationship with the appellate and original jurisdictions of that Court. Article III expressly empowers Congress to make "Exceptions" and "Regulations" to the appellate jurisdiction. U. S. Const., Art. III, § 2, cl. 2; *Ex parte McCardle*, 7 Wall. 506 (1869) (dismissing for want of appellate jurisdiction). But, in what is effectively its narrowest delegation, Art. III is silent regarding Congress' authority to make exceptions to or regulations regarding cases in the original jurisdiction—those that affect "Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party." *Ibid.*

Though the original history of Art. III is sparse,[13] what is available indicates that these textual differences were purposeful on the Framers' part. The Framers obviously thought that the National Government should have a judicial system of its own and that that system should have a Supreme Court. However, because the Framers believed the state courts would be adequate for resolving most disputes, they generally left Congress the power of determining what cases, if any, should be channelled to the federal courts. The one textual exception to that rule concerned the original jurisdiction, where the Framers apparently mandated that Supreme Court review be available. "The evident purpose

---

"In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."

[13] See Note, The Original Jurisdiction of the United States Supreme Court, 11 Stan. L. Rev. 665, and n. 3 (1959).

was to open and keep open the highest court of the nation for the determination, in the first instance, of suits involving a State or a diplomatic or commercial representative of a foreign government." *Ames* v. *Kansas*, 111 U. S. 449, 464 (1884). The Framers apparently thought that "[s]o much was due . . . the rank and dignity of those for whom the provision was made . . . ." *Ibid.;* see also The Federalist No. 81, pp. 507–509 (H. Lodge ed. 1888) (A. Hamilton). Perhaps more importantly, the Framers also thought that the original jurisdiction was a necessary substitute for the powers of war and diplomacy that these sovereigns previously had relied upon. See *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 450 (1945); *United States* v. *Texas*, 143 U. S. 621, 641 (1892). "The Supreme Court [was] given higher standing than any known tribunal, both by the. *nature* of its rights and the *categories* subject to its jurisdiction," A. de Tocqueville, Democracy in America 149 (J. Mayer ed. 1969) (emphasis in original), precisely to keep sovereign nations and States from using force "to rebuff the exaggerated pretensions of the Union . . . ." *Id.*, at 150.

Our cases have long paid tribute to the foreign sovereignty and federalism concerns forming the basis of the original jurisdiction. See *Ames* v. *Kansas, supra,* at 464–465; *Maryland* v. *Louisiana*, 451 U. S. 725, 743 (1981). Out of respect for these concerns, the Court has held that Congress is without power to add parties not within the initial grant of original jurisdiction, see *Marbury* v. *Madison*, 1 Cranch 137, 174 (1803), and has indicated, in dicta, that Congress may not withdraw that jurisdiction either. See, *e. g., California* v. *Arizona*, 440 U. S. 59, 65–66 (1979); *California* v. *Southern Pacific Co.*, 157 U. S. 229, 261 (1895); *Wisconsin* v. *Pelican Insurance Co.*, 127 U. S. 265, 300 (1888); *Ames* v. *Kansas, supra,* at 464; *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 332 (1816); *Marbury* v. *Madison, supra,* at 174. Enlarging the original jurisdiction would require the sovereigns for whom the provision was made to compete with other, less dignified,

parties for the Court's limited time and resources; diminishing the original jurisdiction possibly would leave those sovereigns without an acceptable alternative to diplomacy and war for settling disputes.

To be sure, the Tax Anti-Injunction Act does not expressly withdraw the original jurisdiction of this Court. Rather, it merely prohibits "any court" from "maintain[ing]" a suit that has "the purpose of restraining the assessment or collection" of federal taxes. See 26 U. S. C. § 7421(a). The effect of this prohibition, however, is to preclude this Court ever from assuming original jurisdiction to adjudicate a State *qua* State's Tenth and Sixteenth Amendment tax claims, in apparent derogation of the grant's constitutional purpose.[14] While "Congress has broad powers over the jurisdiction of the federal courts and over the sovereign immunity of the United States[,] it is extremely doubtful that they include the power to limit in this manner the original jurisdiction conferred upon this Court by the Constitution." *California* v. *Arizona*, 440 U. S., at 66.

### B

Nevertheless, it is this Court's longstanding practice to avoid resolution of constitutional questions except when absolutely necessary. *Ibid.* "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be

---

[14] The Solicitor General contends that the Act only fortuitously prevents the State of South Carolina from invoking its constitutional claims in this Court. See Supplemental Memorandum for Defendant 6–7. I do not think the fortuity of the effect saves the statute from constitutional doubt. As the Solicitor General himself reads the Act, it categorically prevents the State of South Carolina from maintaining a suit in this Court's original jurisdiction, which is precisely what Art. III arguably entitles the State to do. The fact that a bond interest recipient can litigate the constitutionality of § 103(j)(1) in due course, see *id.*, at 7, does not mitigate an otherwise effective denial of the original forum to the State of South Carolina.

avoided." *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932). Such a construction is possible in this case.

The manifest purpose of the Tax Anti-Injunction Act is simply to permit the United States to assess and collect taxes without undue judicial interference and to require that legal challenges be raised in certain designated forums. The language and history of the Act evidence a congressional desire generally to bar both taxpayer and nontaxpayer suits, since both can substantially interrupt "the process of collecting the taxes on which the government depends for its continued existence" if left uncontrolled. *State Railroad Tax Cases*, 92 U. S., at 613. Similarly, the language and history evidence a congressional desire to prohibit courts from restraining any aspect of the tax laws' administration, since the prohibition against injunctions should not depend upon the alleged legality or character of a particular assessment. See *Snyder* v. *Marks*, 109 U. S., at 192–194. Yet the statute was enacted against a settled history in which foreign and state sovereigns had a unique right to seek refuge in the original jurisdiction of this Court. Nothing in the legislative history of the Act of 1867, of the later amendments, or of the related declaratory judgment provisions enacted in 1974, 1976, or 1978, mentions any intent to alter these sovereign parties' unique right occasionally to seek injunctive relief by original action in this Court, even with regard to tax matters.

Admittedly, the Act precludes "any court" from maintaining a suit initiated for the purpose of restraining the assessment or collection of federal taxes. See 26 U. S. C. § 7421(a). That language clearly instructs all courts that Congress constitutionally controls not to prematurely interfere with the assessment and collection of federal taxes. That language does not, however, necessarily encompass this Court, which Congress did not create and which Congress is not expressly empowered to make "Exceptions" or "Regulations" as to its original jurisdiction. Moreover, since only a small number of pre-enforcement suits could conceivably involve a party for whom the original jurisdiction was created,

there is no reason to believe that Congress would want to have the constitutionality of its anti-injunction policy placed into question.[15]   Given this *de minimis* effect and the absence of express congressional intent to the contrary, I would conclude that the Act's reference to "any court" means to assure that all *state*, as well as federal, courts are subject to the anti-injunction prohibition.   Such an interpretation gives meaning to the Act and avoids a grave constitutional question.[16]

## III

Interpreting the Tax Anti-Injunction Act to bar both taxpayer and nontaxpayer claims in "any court" but this Court requires a determination whether this case is "appropriate" for the Court's obligatory original jurisdiction. *Illinois* v. *City of Milwaukee*, 406 U. S. 91, 93 (1972).   "[A]lthough it may initially have been contemplated that this Court would always exercise its original jurisdiction when properly called upon to do so," *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493, 497 (1971), our cases recognize "the need [for] exercise of a sound discretion in order to protect this Court from an abuse of the opportunity to resort to its original jurisdiction . . . ." *Massachusetts* v. *Missouri*, 308 U. S. 1, 19 (1939).   An original party establishes that a case is "appropriate" for obligatory jurisdiction by demonstrating, through "clear and convincing evidence," that it has suffered an injury

---

[15] In this vein, Congress itself has recently questioned its power to withdraw the Court's original jurisdiction.   In enacting the Diplomatic Relations Act of 1978, which changed the Court's original jurisdiction of actions involving ambassadors or foreign states from exclusive to concurrent, the Senate Judiciary Committee concluded that "Congress may not deny to the Supreme Court jurisdiction which is expressly granted to it by the Constitution."   S. Rep. No. 95–1108, p. 6 (1978).

[16] Since the Federal Declaratory Judgment Act, 28 U. S. C. § 2201 (1982 ed.), which prohibits "any court of the United States" from declaring rights of parties "with respect to Federal taxes," clearly has no jurisdictional effect, I have no occasion to address it at this time.

of "serious magnitude," see *New York* v. *New Jersey*, 256 U. S. 296, 309 (1921); see also *Alabama* v. *Arizona*, 291 U. S. 286, 292 (1934), and that it otherwise will be without an alternative forum. *Maryland* v. *Louisiana*, 451 U. S., at 740; *Illinois* v. *City of Milwaukee, supra*, at 93. The State of South Carolina's motion for leave to file satisfies, albeit by the barest of margins, both of these tests.[17]

The State has demonstrated injury of "serious magnitude." It contends, and provides uncontroverted affidavits to support, that application of § 103(j)(1) will "materially interfere with and infringe upon the authority of South Carolina to borrow funds." Complaint 16. The authority the State claims has significant historical basis, see *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429 (1895), and the injury the State alleges could deprive it of a meaningful political choice. See *Colorado* v. *Kansas*, 320 U. S. 383, 393, and n. 8 (1943). Twenty-four States have filed a joint brief *amici curiae* in support of South Carolina's motion, which further attests to the "serious magnitude" of the federalism concerns at issue.

Similarly, the State *qua* State has demonstrated that it has no adequate alternative forum in which to raise its unique Tenth and Sixteenth Amendment claims. See *Maryland* v. *Lousiana, supra*, at 743, and n. 19. If the State issues bearer bonds and urges its purchasers to contest the legality of § 103(j)(1), it will suffer irremedial injury. The purchasers will inevitably demand higher interest rates as compensation for bearing the risk of future potential federal taxes. Conversely, if the State forsakes bearer bonds in favor of registered ones, it will bear the increased expense that issuers of registered bonds incur, and it will be unable ever to contest the constitutionality of § 103(j)(1). In short, the State will

---

[17] The Solicitor General concedes that, absent a bar from the Anti-Injunction Act, this case falls within the literal terms of the constitutional and statutory grant of original jurisdiction to this Court. See Supplemental Memorandum for Defendant 1–2.

suffer irremedial injury if the Court does not assume original jurisdiction.

Therefore, although great deference is due the longstanding congressional policy against premature judicial interference with federal taxes, I believe it is proper to exercise the Court's original jurisdiction under these unique circumstances. I emphasize both the unique circumstances of this case and the congressional policy against premature judicial interference because original litigants should not be misled into believing that this Court will become a haven for suits that cannot be entertained in lower courts with concurrent jurisdiction. The original jurisdiction is not a forum for litigating everyday tax concerns. Rather, it must be "sparingly" invoked. *United States* v. *Nevada*, 412 U. S. 534, 538 (1973). Moreover, the legislative policy against premature judicial interference embodied in the Act must be paid the highest deference by this Court. Thus, where the original party does not present a clear and convincing case that the tax at issue will impair its ability to structure integral operations of its government *and* that irremedial injury is likely to occur absent review in the original jurisdiction, I would defer to the legislative directive against premature judicial interference.[18] But since South Carolina's claims meet these stringent requirements, its motion for leave to file should be granted.

## IV

I agree with the Court that the record is not sufficiently developed to permit us to address the merits and that a Special Master should be appointed. But I do not share its view

---

[18] Thus, where Congress expressly leaves open an alternative forum in which an original plaintiff can raise its claims, this Court will ordinarily presume that original jurisdiction is inappropriate. For example, where Congress allows the state, but not the federal, courts to issue injunctive relief, as Congress has done in the Norris-La Guardia Act, 29 U. S. C. § 104, and § 2283 of the Judicial Code, 28 U. S. C. § 2283, an original plaintiff could rarely, if ever, demand access to the obligatory original jurisdiction.

that the Tax Anti-Injunction Act applies only when Congress has provided an alternative avenue for a complaining party— one with original status or not—to litigate claims on its own behalf. That view is not, in my opinion, based on any fair or even tenable canon of statutory construction, and cannot be reconciled with express statements of congressional intent and purpose. Accordingly, I can concur only in the Court's judgment.

JUSTICE STEVENS, concurring in part and dissenting in part.

While I join Parts I and II of the Court's opinion, I disagree with Part III. The Solicitor General has persuaded me that the Court should exercise its discretion to deny leave to file this complaint. We should do so not only because the proceeding can be conducted more expeditiously in another forum,[1] but also because it is so plain that even if we read the complaint liberally in favor of the State of South Carolina, there is simply no merit to the claim the State has advanced. I do not believe the Court does a sovereign State a favor by giving it an opportunity to expend resources in litigation that has no chance of success. I would therefore deny leave to file.

South Carolina claims that § 103(j)(1) of the Internal Revenue Code of 1954, 26 U. S. C. § 103(j)(1) (1982 ed.), as added

---

[1] As the Solicitor General points out: "[T]his case is particularly inappropriate for the exercise of this Court's discretionary original jurisdiction. First, given the demands on this Court's original and appellate docket, it seems plain that a district court could hear the case more promptly. This is especially true in light of the fact that to support its claim, South Carolina would undoubtedly seek to introduce evidence of the actual burden imposed upon it by the federal tax statute. Such a proceeding could be more expeditiously conducted at the usual trial court level by a federal district court." Brief in Opposition 12. See *United States* v. *Nevada*, 412 U. S. 534, 538 (1973); *Washington* v. *General Motors Corp.*, 406 U. S. 109 (1972); *Illinois* v. *City of Milwaukee*, 406 U. S. 91 (1972); *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U. S. 493 (1971).

by § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, 96 Stat. 596, is unconstitutional because it abridges the State's power to borrow money.   Under the federal statute, the income that private citizens receive from state bonds is taxed unless the bonds are issued in registered form.   As a practical matter, this requirement will force South Carolina to issue its bonds in registered form.   Its complaint alleges that registered bonds are more costly to issue than bearer bonds and therefore that its future bond issues will generate smaller net revenues for the State.

Although the State's constitutional arguments are not stated in precisely this form, in essence it claims that the statute is invalid because it violates: (1) the doctrine of intergovernmental tax immunity; (2) the Tenth Amendment; and (3) the doctrine of *National League of Cities* v. *Usery*, 426 U. S. 833 (1976).   A long line of cases plainly forecloses the first claim; the other two are frivolous.

## I

The origins of intergovernmental taxation immunity are found in *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819).   Of course, *McCulloch* dealt not with the immunity of the States, but rather with that of the United States.   The Court held that the State of Maryland could not constitutionally tax the Bank of the United States because the power to tax the bank could be used to destroy it, thereby undermining the constitutionally guaranteed supremacy of the Federal Government.   See *id.*, at 425–437.   The Court's argument was premised explicitly upon the Supremacy Clause of the Constitution, and thus its holding did not require that any immunity from taxation be accorded the States.[2]

Therefore, the case upon which South Carolina relies is not *McCulloch* but *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429 (1895).   There the Court specifically held that a

---

[2] Moreover, *McCulloch* dealt with a tax imposed directly upon a governmental body, rather than a tax imposed upon an individual's income derived from his dealings with a governmental body.

provision of the federal income tax statute taxing income de-
rived from municipal bonds was unconstitutional.   It noted
that the Court had previously held that the United States
lacks the authority to tax the property or revenues of States
or municipalities, since their independence from federal con-
trol is secured by the Tenth Amendment.   Of the cases cited
by the Court, most dealt with whether the Federal Govern-
ment could lay a tax directly upon the property of States or
localities, paid by them.   In only one, *Collector* v. *Day*, 11
Wall. 113 (1871), did the Court address whether the United
States could tax the income of an individual derived from his
dealings with a State.  There, the Court had held that the
United States could not tax the salaries of judicial officers of
a State.   After reciting this case law, the Court continued:

> "It is contended that although the property or revenues
> of the States or their instrumentalities cannot be taxed,
> nevertheless the income derived from state, county, and
> municipal securities can be taxed.   But we think the
> same want of power to tax the property or revenues of
> the States or their instrumentalities exists in relation to
> a tax on the income from their securities, and for the
> same reason,, and that reason is given by Chief Justice
> Marshall in *Weston* v. *Charleston*, 2 Pet. 449, 468, where
> he said: 'The right to tax the contract to any extent,
> when made, must operate upon the power to borrow be-
> fore it is exercised, and have a sensible influence on the
> contract.   The extent of this influence, depends on the
> will of a distinct government.   To any extent, however
> inconsiderable, it is a burthen on the operations of gov-
> ernment.   It may be carried to an extent which shall ar-
> rest them entirely. . . . The tax on government stock is
> thought by this court to be a tax on the contract, a tax on
> the power to borrow money on the credit of the United
> States, and consequently to be repugnant to the Con-
> stitution.'   Applying this language to these municipal
> securities, it is obvious that taxation on the interest
> therefrom would operate on the power to borrow before

it is exercised, and would have a sensible influence on the contract, and that the tax in question is a tax on the power of the States and their instrumentalities to borrow money, and consequently repugnant to the Constitution." 157 U. S., at 585–586 (ellipsis in original).

The theory employed in *Pollock* is what I shall refer to as the "intergovernmental burden" theory: even though a tax is not laid directly upon another government, if it has a "sensible influence" on the costs incurred by that government, it must fall. This theory is the only rationale offered by the *Pollock* Court for its decision, and it is on this theory that *Pollock* must stand or fall.

The precedential weight of *Pollock* was doubtful almost from the start. Within a generation *Pollock* was seemingly overruled by constitutional amendment. The Sixteenth Amendment, ratified in 1913, states: "The Congress shall have power to lay and collect taxes on incomes, *from whatever source derived*, without apportionment among the several States, and without regard to any census or enumeration." (Emphasis supplied.) This clear language makes the fact that income is derived from interest on state or local obligations constitutionally irrelevant.

Any doubt about the vitality of *Pollock* is dispelled by our subsequent cases. At every opportunity, this Court has rejected the intergovernmental burden theory.

In *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514 (1926), the Court first rejected the theory. It held that the United States could tax the income derived by an independent contractor from its contracts with a State. The Court recognized that the federal tax increased costs incurred by the State,[3] but nevertheless upheld the tax:

---

[3] The Court easily dismissed the conceptual basis for the intergovernmental burden theory, correctly observing that every exercise of taxing power necessarily creates such a burden.

"In a broad sense, the taxing power of either [the state or federal] government, even when exercised in a manner admittedly necessary and

"[H]ere the tax is imposed on the income of one who is neither an officer nor an employee of government and whose only relation to it is that of contract, under which there is an obligation to furnish service, for practical purposes not unlike a contract to sell and deliver a commodity. The tax is imposed without discrimination upon income whether derived from services rendered to the state or services rendered to private individuals. In such a situation it cannot be said that the tax is imposed upon an agency of government in any technical sense, and the tax cannot be deemed to be an interference with government, or an impairment of the efficiency of its agencies in any substantial way." *Id.*, at 524–525.[4]

Thus, the conceptual basis for *Pollock* had been undermined. A burden on the State imposed by taxing those who contract with it was no longer sufficient to invalidate a tax; the theory that a State's contracts could not be taxed which the Court had relied upon in *Pollock* was no longer good law.[5]

---

proper, unavoidably has some effect upon the other. The burden of federal taxation necessarily sets an economic limit to the practical operation of the taxing power of the states, and *vice versa*. Taxation by either the state or the federal government affects in some measure the cost of operation of the other." 269 U. S., at 523.

[4] In *James* v. *Dravo Contracting Co.*, 302 U. S. 134 (1937), the Court followed *Metcalf & Eddy* in holding that a State could tax the income of an independent contractor of the United States. See also *Atkinson* v. *Tax Comm'n*, 303 U. S. 20, 21 (1938) *(per curiam); Silas Mason Co.* v. *Tax Comm'n*, 302 U. S. 186 (1937). Similarly, in *Willcuts* v. *Bunn*, 282 U. S. 216 (1931), the Court held that capital gains derived from sales of municipal bonds could be taxed by the United States, despite the fact that this tax would reduce the value of the bonds. See also *Greiner* v. *Lewellyn*, 258 U. S. 384 (1922) (federal estate tax may be levied upon the value of state bonds transferred upon death).

[5] This was made even clearer in *Helvering* v. *Mountain Producers Corp.*, 303 U. S. 376 (1938), where the Court upheld the power of the United States to tax income derived from property leased from a State.

"[I]mmunity from non-discriminatory taxation sought by a private person for his property or gains because he is engaged in operations under a gov-

In *Helvering* v. *Gerhardt*, 304 U. S. 405 (1938), the repudiation of *Pollock* was unmistakable. The Court there held that the United States could tax the salaries of state employees. The Court began its analysis by pointing out that the scope of *McCulloch* was limited to state taxation of federal instrumentalities.[6] The Court read *Weston* v. *Charleston*, 2 Pet. 449 (1829), on which the *Pollock* Court had relied, as also limited in its application to state taxes, involving as it did an attempt whereby through state taxation "an impediment was laid upon the exercise of a power with respect to which the national government was supreme." 304 U. S., at 413, n. 3. It concluded that state immunity against federal taxation must be narrowly construed since "the people of all the states have created the national government and are represented in Congress. Through that representation they exer-

---

ernment contract or lease cannot be supported by merely theoretical conceptions of interference with the functions of government. Regard must be had to substance and direct effects. And where it merely appears that one operating under a government contract or lease is subjected to a tax with respect to his profits on the same basis as others who are engaged in similar businesses, there is no sufficient ground for holding that the effect upon the Government is other than indirect and remote." *Id.*, at 386–387. See also *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, 369–370 (1938).

[6] "In sustaining the immunity from state taxation, the opinion of the Court, by Chief Justice Marshall, recognized a clear distinction between the extent of the power of a state to tax national banks and that of the national government to tax state instrumentalities. He was careful to point out not only that the taxing power of the national government is supreme, by reason of the constitutional grant, but that in laying a federal tax on state instrumentalities the people of the states, acting through their representatives, are laying a tax on their own institutions and consequently are subject to political restraints which can be counted on to prevent abuse. State taxation of national instrumentalities is subject to no such restraint, for the people outside the state have no representatives who participate in the legislation; and in a real sense, as to them, the taxation is without representation. The exercise of the national taxing power is thus subject to a safeguard which does not operate when a state undertakes to tax a national instrumentality." 304 U. S., at 412 (footnote omitted).

cise the national taxing power. The very fact that when they are exercising it they are taxing themselves, serves to guard against its abuse . . . ." *Id.*, at 416. Moreover,

> "any allowance of a tax immunity for the protection of state sovereignty is at the expense of the sovereign power of the nation to tax. Enlargement of the one involves diminution of the other. When enlargement proceeds beyond the necessity of protecting the state, the burden of the immunity is thrown upon the national government with benefit only to a privileged class of taxpayers. . . . [I]f every federal tax which is laid on some new form of state activity, or whose economic burden reaches in some measure the state or those who serve it, were to be set aside as an infringement of state sovereignty, it is evident that a restriction on the national power, devised only as a shield to protect the states from curtailment of the essential operations of government which they have exercised from the beginning, would become a ready means for striking down the taxing power of the nation." *Id.*, at 416–417.

The Court concluded by explicitly rejecting the intergovernmental burden theory:

> "The state and national governments must co-exist. Each must be supported by taxation of those who are citizens of both. The mere fact that the economic burden of such taxes may be passed on to a state government and thus increase to some extent, here wholly conjectural, the expense of its operation, infringes no constitutional immunity. Such burdens are but normal incidents of the organization within the same territory of two governments, each possessed of the taxing power." *Id.*, at 422.

In *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466 (1939), the Court held that a State could tax the salary of a

federal employee.[7]    After again observing that state tax-
ation immunity is narrower than that of the United States,
see *id.*, at 477–478, and should be narrowly construed, see
*id.*, at 483–484, the Court followed *Gerhardt* in upholding the
state tax, overruled *Collector* v. *Day*, which had been relied
upon in *Pollock*, and noted, in a passage pertinent to the
claim made here by South Carolina, that "we perceive no

---

[7]Justice Frankfurter, in his separate opinion, explained how state immu-
nity from taxation had been derived incorrectly from dicta in *McCulloch*.
"Partly as a flourish of rhetoric and partly because the intellectual fashion
of the times indulged a free use of absolutes, Chief Justice Marshall gave
currency to the phrase that 'the power to tax involves the power to de-
stroy.' This dictum was treated as though it were a constitutional man-
date. . . . The seductive *cliché* that the power to tax involves the power
to destroy was fused with another assumption, likewise not to be found in
the Constitution itself, namely the doctrine that the immunities are cor-
relative—because the existence of the national government implies immu-
nities from state taxation, the existence of state governments implies
equivalent immunities from federal taxation. . . .

"All these doctrines of intergovernmental immunity have until recently
been moving in the realm of what Lincoln called 'pernicious abstractions.'
The web of unreality spun from Marshall's famous dictum was brushed
away by one stroke of Mr. Justice Holmes's pen: 'The power to tax is not
the power to destroy while this Court sits.' *Panhandle Oil Co.* v. *Missis-
sippi*, 277 U. S. 218, 223 (dissent). Failure to exempt public functionaries
from the universal duties of citizenship to pay for the costs of government
was hypothetically transmuted into hostile action of one government
against the other. A succession of decisions thereby withdrew from the
taxing power of the States and Nation a very considerable range of wealth
without regard to the actual workings of our federalism, and this, too,
when the financial needs of all governments began steadily to mount." 306
U. S., at 489–490 (concurring opinion) (citation and footnote omitted).

Justice Frankfurter later added: "Chief Justice Marshall spoke at a time
when social complexities did not so clearly reveal as now the practical limi-
tations of a rhetorical absolute. . . . To press a juristic principle designed
for the practical affairs of government to abstract extremes is neither
sound logic nor good sense. And this Court is under no duty to make law
less than sound logic and good sense." *New York* v. *United States*, 326
U. S. 572, 576–577 (1946) (opinion of Frankfurter, J.).

basis for a difference in result whether the taxed income be salary or some other form of compensation . . . ." 306 U. S., at 486. The Court concluded by again repudiating the intergovernmental burden theory.

> "So much of the burden of a non-discriminatory general tax upon the incomes of employees of a government, state or national, as may be passed on economically to that government, through the effect of the tax on the price level of labor or materials, is but the normal incident of the organization within the same territory of two governments, each possessing the taxing power. The burden, so far as it can be said to exist or to affect the government in any indirect or incidental way, is one which the Constitution presupposes, and hence it cannot rightly be deemed to be within an implied restriction upon the taxing power of the national and state governments which the Constitution has expressly granted to one and has confirmed to the other." *Id.*, at 487.[8]

The intergovernmental burden theory was rejected about as clearly as possible in *Alabama* v. *King & Boozer*, 314 U. S. 1 (1941), in which the Court upheld a state sales tax levied on the cost of material used by a federal contractor in performing a cost-plus contract, despite the fact that under the contract the economic burden of the tax fell exclusively on the United States.[9]  Subsequently, the Court has consistently adhered to its repudiation of the intergovernmental

---

[8] See also *Sims* v. *United States*, 359 U. S. 108, 110–111 (1959); *State Tax Comm'n* v. *Van Cott*, 306 U. S. 511 (1939).

[9] "So far as such a non-discriminatory state tax upon the contractor enters into the cost of the materials to the Government, that is but a normal incident of the organization within the same territory of two independent taxing sovereignties.  The asserted right of the one to be free of taxation by the other does not spell immunity from paying the added costs, attributable to the taxation of those who furnish supplies to the Government and who have been granted no tax immunity." 314 U. S., at 8–9.

burden theory.   See *Washington* v. *United States*, 460 U. S. 536, 540 (1983); *Memphis Bank & Trust Co.* v. *Garner*, 459 U. S. 392, 397 (1983); *United States* v. *New Mexico*, 455 U. S. 720, 734 (1982); *United States* v. *County of Fresno*, 429 U. S. 452, 460–462 (1977); *Gurley* v. *Rhoden*, 421 U. S. 200, 205 (1975).   As the Court recently wrote, "an economic burden on traditional state functions without more is not a sufficient basis for sustaining a claim of immunity."   *Massachusetts* v. *United States*, 435 U. S. 444, 461 (1978).[10]

Perhaps the plainest explication of this Court's position on state tax immunity is found in *New York* v. *United States*, 326 U. S. 572 (1946), a case holding that the United States could tax New York's income from its sale of state-owned mineral waters.   Justice Frankfurter, joined by Justice Rutledge, wrote that in his view any nondiscriminatory tax on

---

[10] While the Court, for a time, did continue to cite *Pollock* either in dicta, see *Indian Motorcycle Co.* v. *United States*, 283 U. S. 570, 577 (1931); *Gillespie* v. *Oklahoma*, 257 U. S. 501, 505 (1922); *Farmers & Mechanics Savings Bank of Minneapolis* v. *Minnesota*, 232 U. S. 516, 526–527 (1914); or only to distinguish it in the course of upholding federal taxes on state instrumentalities, see *Helvering* v. *Gerhardt*, 304 U. S. 405, 417 (1938); *Helvering* v. *Mountain Producers Corp.*, 303 U. S., at 386; *Choteau* v. *Burnet*, 283 U. S. 691, 696 (1931); *Willcuts* v. *Bunn*, 282 U. S., at 225; *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 521 (1926); *Greiner* v. *Lewellyn*, 258 U. S., at 386; *South Carolina* v. *United States*, 199 U. S. 437, 453 (1905); see also *New York ex rel. Cohn* v. *Graves*, 300 U. S. 308, 315–316 (1937); it has long since stopped treating *Pollock* with even that much respect; the Court has not cited the holding of *Pollock* since *Gerhardt*, almost half a century ago.   As I have suggested above, however, the rationale of *Pollock* had been repudiated at least as early as *Metcalf & Eddy*.   Moreover, it appears that the Court has *never* relied on *Pollock* for a holding since the passage of the Sixteenth Amendment.   Chief Justice Hughes once referred to *Pollock*, along with *Scott* v. *Sandford*, 19 How. 393 (1857), overruled by U. S. Const., Amdt. 14, and *Hepburn* v. *Griswold*, 8 Wall. 603 (1870), overruled by *Legal Tender Cases*, 12 Wall. 457 (1872), as one of the "three notable instances [in which] the Court has suffered severely from self-inflicted wounds."   C. Hughes, The Supreme Court of the United States 50 (1928).

state activities was constitutional. See *id.*, at 581–584 (opinion of Frankfurter, J.); see also *id.*, at 584–585 (Rutledge, J., concurring). Four additional Justices agreed that the tax was valid, stating: "Only when and because the subject of taxation is State property or a State activity must we consider whether such a non-discriminatory tax unduly interferes with the performance of the State's functions of government." *Id.*, at 588 (Stone, C. J., joined by Reed, Murphy, and Burton, JJ., concurring in result).[11]

*S. R. A., Inc.* v. *Minnesota*, 327 U. S. 558 (1946), was decided during the same Term. There, land owned by the United States was occupied by S. R. A., which had bought the land under a conditional sales contract that left title in the United States pending full payment of the purchase price. Nevertheless, the Court held that state property taxes could be assessed against the land, since in reality the private

---

[11] These Justices made it clear that the immunity doctrine applies only when the State itself is the taxpayer.

"If the phrase 'non-discriminatory tax' is to be taken in its long accepted meaning as referring to a tax laid on a like subject matter, without regard to the personality of the taxpayer, whether a State, a corporation or a private individual, it is plain that there may be non-discriminatory taxes which, when laid on a State, would nevertheless impair the sovereign status of the State quite as much as a like tax imposed by a State on property or activities of the national government. This is not because the tax can be regarded as discriminatory *but because a sovereign government is the taxpayer,* and the tax, even though non-discriminatory, may be regarded as infringing its sovereignty." 326 U. S., at 587 (emphasis supplied) (citation omitted).

In more recent cases we have found immunity only where the governmental entity itself is legally obligated to bear the costs of the tax. See *United States* v. *New Mexico*, 455 U. S. 720 (1982); *United States* v. *County of Fresno*, 429 U. S. 452 (1977); *United States* v. *Mississippi Tax Comm'n*, 421 U. S. 599 (1975); *Gurley* v. *Rhoden*, 421 U. S. 200 (1975); *First Agricultural National Bank of Berkshire County* v. *Tax Comm'n*, 392 U. S. 339, 346–348 (1968); *Rohr Aircraft Corp.* v. *County of San Diego*, 362 U. S. 628 (1960); *Kern-Limerick, Inc.* v. *Scurlock*, 347 U. S. 110 (1954).

party and not the United States was being taxed.[12]   Thus the Court recognized that where the property inures to the benefit of a private party, it has no immunity from taxation despite the fact that the taxation may increase the costs imposed on the governmental entity.[13]   The same approach was taken in *United States* v. *City of Detroit*, 355 U. S. 466 (1958), when the Court upheld a municipal tax on property owned by the United States but leased to a private party, observing that "it is well settled that the Government's constitutional immunity does not shield private parties with whom it does business from state taxes imposed on them merely because part or all of the financial burden of the tax eventually falls on the Government." *Id.*, at 469.[14]   See also *United States* v. *Township of Muskegon*, 355 U. S. 484 (1958); *City of Detroit* v. *Murray Corp.*, 355 U. S. 489 (1958); *Wilmette Park Dist.* v. *Campbell*, 338 U. S. 411, 419–420 (1949).

Our cases thus demonstrate the insubstantiality of South Carolina's claim.   Under § 103(j)(1), South Carolina is not required to pay *any* federal tax at all.   The tax is imposed not upon state property or revenues, but only upon persons with whom it contracts.   Under the test adopted by a majority of the Court in *New York* v. *United States*, and followed since,

---

[12] "To say that the payment of the purchase price is a necessary condition precedent to the loss of federal immunity is to make the rule too mechanical.   It should be sufficiently flexible to subject real private rights, disentangled from federal policies, to state taxation." 327 U. S., at 569.

[13] The Court briefly disposed of the intergovernmental burden theory: "There is a suggestion that to hold United States property subject to state taxation pending the completion of payment will injuriously affect its salability and therefore interfere with the Government's handling of its affairs.   Our recent cases have disposed of this economic argument in a way which is contrary to petitioner's contention." *Id.*, at 570.

[14] "It is undoubtedly true, as the Government points out, that it will not be able to secure as high rentals if lessees are taxed for using its property.   But . . . the imposition of an increased financial burden on the Government does not, by itself, vitiate a state tax." 355 U. S., at 472.

this alone defeats its claim. South Carolina is trying to shield private parties with whom it does business from taxation because part of the financial burden of the tax falls upon it. This Court has repeatedly rejected exactly that sort of claim.[15] Moreover, the rationale on which *Pollock* is based—the intergovernmental burden theory—has been repudiated over and over again by this Court. There is simply nothing left of *Pollock* on which South Carolina can base a claim.

Even if there were enough left of *Pollock* to invalidate a federal tax that might cripple traditional state functions, the burden imposed on the State here is far from crushing. South Carolina estimates that if it must issue its bonds in registered form it will have to pay an additional one quarter of one percent interest on its bonds.[16] It identifies in its offer of

---

[15] A host of commentators agree. See, *e. g.*, Kirby, State and Local Bond Interest, in 1 House Committee on Ways and Means, Tax Revision Compendium 679 (Comm. Print 1959); Senate Special Committee on Taxation of Governmental Securities and Salaries, Taxation of Governmental Securities and Salaries, S. Rep. No. 2140, 76th Cong., 3d Sess., pt. 1, pp. 8–16, 25–28 (1940); U. S. Dept. of Justice, Taxation of Government Bondholders and Employees: The Immunity Rule and the Sixteenth Amendment (1938); Boudin, The Taxation of Governmental Instrumentalities, Part Two, 22 Geo. L. J. 254 (1934); Brown, Intergovernmental Tax Immunity: Do We Need a Constitutional Amendment?, 25 Wash. U. L. Q. 153 (1940); Gardner, Tax Immune Bonds, 8 Geo. Wash. L. Rev. 1200 (1940); Philipsborn & Cantrill, Immunity from Taxation of Governmental Instrumentalities, 26 Geo. L. J. 543 (1938); Rakestraw, The Reciprocal Rule of Governmental Tax Immunity—A Legal Myth, 11 Federal B. J. 3 (1950); Ratchford, Intergovernmental Tax Immunities in the United States, 6 National Tax J. 305 (1953); Watkins, The Power of the State and Federal Governments to Tax One Another, 24 Va. L. Rev. 475 (1938); Federal Legislation, Taxability of Government-Bond Interest, 27 Geo. L. J. 768 (1939); Note, The Passing of Intergovernmental Tax Immunity, 33 Ill. L. Rev. 962 (1939); Note, Constitutional and Legislative Bases of Intergovernmental Tax Immunities, 51 Yale L. J. 482 (1942).

[16] As an example, South Carolina states that on November 9, 1982, it sold $115 million in general obligation bonds. Over the life of these bonds South Carolina will pay $97,247,668 in interest. If the bonds were issued

proof no disruption in its operation except for this slight increase in interest costs.[17]  Surely this cost is infinitesimal compared to the costs imposed on States and localities because their employees' salaries are federally taxed—a burden that the Federal Government unquestionably has the constitutional power to impose.  Moreover, the challenged statute still provides States and localities with the ability to offer debt instruments at substantially less than the market rates which must be paid by private enterprise—three to five points lower according to South Carolina's estimate.  It is hard to see how marginal increases in the interest they must pay can destroy the integrity of governmental entities when private entities are able not only to survive but generally to make a profit while obtaining financing at significantly higher rates of interest.  As Professor Thomas Reed Powell observed:

> "Public bonds will not be put in an unfavorable position relatively by being subjected to taxes on the income. They will merely be deprived of an artificial advantage heretofore enjoyed, which however is not strictly necessary in all probability in order to give them a practical success on the financial markets of the country when offered at the same rates of interest that have usually been offered in the past."  Powell, Intergovernmental Tax Immunities, 8 Geo. Wash. L. Rev. 1213, 1214–1215 (1940).

In contrast to the slight burden alleged by South Carolina, the Federal Government's interest in encouraging bearer bonds to be issued in registered form is substantial, as the Senate Report on this provision makes clear.

---

in registered form, its interest costs would be increased only about $2,800,000—approximately three percent.

[17] *Amici* Texas et al. have submitted affidavits which also indicate only that they will pay slightly higher interest charges if they must issue bonds in registered form.  No allegations are made that serious disruptions in the ability of States and localities to provide essential services will result.

"The Committee believes that a fair and efficient system of information reporting and withholding cannot be achieved with respect to interest-bearing obligations as long as a significant volume of long-term bearer instruments is issued. A system of book-entry registration will preserve the liquidity of obligations while requiring the creation of ownership records that can produce useful information reports with respect to both the payment of interest and the sale of obligations prior to maturity through brokers. Furthermore, registration will reduce the ability of noncompliant taxpayers to conceal income and property from the reach of the income, estate, and gift taxes. Finally, the registration requirement may reduce the volume of readily negotiable substitutes for cash available to persons engaged in illegal activities." S. Rep. No. 97–494, pt. 1, p. 242 (1982).

As this Court has previously held, the Constitution does not invalidate every burden on a State or locality created by federal taxation because such burdens are the "normal incident" of a system of dual sovereigns with dual taxing powers, which the Constitution envisions will coexist. Surely it follows that the Constitution intended that the taxing power it gave the Federal Government not be undermined through the abuse engendered by bearer instruments. The burden imposed upon States and localities by efforts to eliminate such abuse is one necessary in a system committed to the efficacy of dual taxing authorities.

The fairness of this requirement is highlighted by the fact that § 103(j)(1) requires that federally issued bonds also be in registered form to be tax exempt. Even in the heyday of *Pollock*, the Court never held that the Federal Government impermissibly infringed state sovereignty by imposing a burden on the States that it also imposed on itself. If Congress has destroyed some protected concept of state sovereignty through § 103(j)(1), then it has destroyed the sovereignty of the United States as well.

## II

South Carolina's complaint alleges that § 103(j)(1) violates the Tenth Amendment. That Amendment provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

In order to bring its challenge within the terms of that Amendment, South Carolina alleges:

"The Congress of the United States has no power whatsoever to impose an income tax upon the interest paid by South Carolina to its lenders." Complaint ¶ 9.

This allegation is inconsistent with the plain language of the Constitution itself. Article I, § 8, specifically delegates to Congress the "Power To lay and collect Taxes," and the Sixteenth Amendment removes any possible ambiguity concerning the scope of the power exercised by Congress in this case. The cases I have discussed above confirm this point.

Because the power to tax private income has been expressly delegated to Congress, the Tenth Amendment has no application to this case.

## III

Finally, South Carolina relies on *National League of Cities* v. *Usery*, 426 U. S. 833 (1976). In that case the Court held that a federal statute extending the provisions of the Fair Labor Standards Act to certain public employees was "not within the authority granted Congress by Art. I, § 8, cl. 3." *Id.*, at 852 (footnote omitted). The conclusion that the case merely involved an interpretation of the outer limits of the congressional power to regulate interstate commerce was then confirmed by the following footnote:

"We express no view as to whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such

as the spending power, Art. I, §8, cl. 1, or §5 of the Fourteenth Amendment." *Id.*, at 852, n. 17.

By its express terms, therefore, the *National League of Cities* case has no application to South Carolina's challenge to an exercise of the federal taxing power.[18]

In sum, I can see no basis on which South Carolina could prevail in this case, even accepting its allegations and offers of proof for all they are worth. We do South Carolina no favor by permitting it to file and litigate a claim on which it has no chance of prevailing. At the same time, the Court's decision to permit South Carolina to file this claim is an unwise use of its scarce resources. Accordingly, I respectfully dissent from the Court's decision to grant South Carolina's motion for leave to file its complaint.

---

[18] To come within that case, an exercise of Commerce Clause power must (1) regulate the States as States, (2) address indisputable attributes of state sovereignty, and (3) directly impair the traditional functions of the States. *EEOC* v. *Wyoming,* 460 U. S. 226, 236–237 (1983); *FERC* v. *Mississippi,* 456 U. S. 742, 764, n. 28 (1982); *Hodel* v. *Virginia Surface Mining & Recl. Assn.,* 452 U. S. 264, 287–288 (1981). Even then, the claim fails if the federal interest outweighs those of the States. See *EEOC* v. *Wyoming, supra,* at 237; *Hodel, supra,* at 288, n. 29. Assuming *National League of Cities* were applicable here, South Carolina's claim would fail on all counts. First, § 103(j)(1) does not regulate the States at all; they are free to issue any type of bonds they like, only the tax consequences for purchasers are affected. Second, the right to issue unregistered bearer bonds has never been considered an indisputable aspect of sovereignty. Third, the offers of proof detail no impairment of its ability to function; only marginal increases in interest costs are demonstrated. The kind of impact on state and local budgets detailed in *National League of Cities,* 426 U. S., at 846–847, 849–851, is not present here. Finally, the federal interest in eliminating a practice which undermines the enforceability of the federal tax system and laws surely is sufficient to outweigh the modest fiscal burdens imposed upon the States by this measure.