995 F.2d 238
 301 U.S.App.D.C. 338, 61 USLW 2751
 NATIONAL TRUST FOR HISTORIC PRESERVATION IN the UNITED
STATES; Historic Preservation League, Inc., a
Non-Profit Corporation; Historic
Preservation League of Dallas,
Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION; Andrew C. Hove, Jr.,
In His Official Capacity as Acting Chairman,
Federal Deposit Insurance Corporation, Appellees.
 No. 93-5137.
 United States Court of Appeals,
District of Columbia Circuit.
May 28, 1993.
Suggestion for Rehearing En Banc
Denied Oct. 21, 1993.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 93-00904).
 David Armour Doheny, Elizabeth Sherrill Merritt, Andrea C. Ferster, and Richard Bart Nettler, Washington, DC, were on the motion for stay, for appellants.
 Ann Scharnikow DuRoss and Jerome A. Madden, Attorneys, F.D.I.C., Washington, DC, were on the opposition to the motion for stay.
 Before: WALD, RUTH BADER GINSBURG and RANDOLPH, Circuit Judges.
 Opinion for the court filed Per Curiam.
 
 
 1
 Dissenting opinion filed by Circuit Judge WALD.
 
 PER CURIAM:
 
 2
 The Federal Deposit Insurance Corporation (FDIC), acting as a liquidator with the powers of a receiver, see 12 U.S.C. § 1823(d)(3)(A), is in the process of selling the Dr. Pepper Headquarters Building in Dallas, Texas. The National Trust for Historic Preservation in the United States, the Historic Preservation League, Inc., and the Historic Preservation League of Dallas (collectively, the National Trust), sued to enjoin the transaction on the ground that the FDIC's contemplated sale would violate the [301 U.S.App.D.C. 339] National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 et seq. The NHPA requires, among other things, that federal agencies "take into account" possible adverse effects of agency "undertakings" on properties included in or eligible to be included in the National Register of Historic Places, and afford the Advisory Council on Historic Preservation "a reasonable opportunity to comment with regard to such undertaking[s]." See16 U.S.C. § 470f. The National Trust alleges that the FDIC is subject to the NHPA's requirements and has unlawfully ignored them in connection with the impending sale of the Dr. Pepper Building. The private buyer of the Dr. Pepper Building, all parties agree, would have no duty to comply with the federal preservation statute after acquiring the property. Once the impending sale is consummated, the National Trust thus will have no judicial or administrative recourse against this alleged violation of federal law by the FDIC.
 
 
 3
 The district court issued a temporary restraining order barring the sale, see National Trust for Historic Preservation v. FDIC, No. 93-0904, 1993 WL 328134 (D.D.C. May 7, 1993); a week later, the court (acting through a different district judge) denied the National Trust's motion for a preliminary injunction and dismissed the action for lack of jurisdiction, see id., 1993 WL 211773 (D.D.C. May 14, 1993). In dismissing the action, the district court relied exclusively on 12 U.S.C. § 1821(j). We agree that § 1821(j) bars the National Trust's suit for injunctive relief; accordingly, we deny the National Trust's motion for a stay pending appeal, and affirm the dismissal.
 
 Section 1821(j) states:
 
 4
 Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver.
 
 
 5
 Here, the powers and functions the FDIC is exercising are, by statute, deemed to be those of a receiver. See 12 U.S.C. § 1823(d)(3)(A). An injunction against the planned sale would surely "restrain or affect" the FDIC's exercise of those powers or functions. We reject the National Trust's argument that § 1821(j) applies only to claims that are themselves subject to the administrative claims procedures set out in 12 U.S.C. § 1821(d). Section 1821(j) is not so limited.[1]
 
 
 6
 Nothing in the text of § 1821(j) limits its application to claims brought by creditors or others who have recourse to the administrative claims regime of 12 U.S.C. § 1821(d). Cf. 28 U.S.C. § 1341 (explicitly limiting ban on federal injunctions against assessment of state taxes to cases in which there is a "plain, speedy and efficient remedy" in state court). The exclusivity of the FDIC's administrative claims provisions stems from another provision located, as one might expect for an exclusivity-of-remedies provision, directly after the claims procedures prescribed in § 1821(d). That provision, set out in § 1821(d)(13)(D) and entitled "Limitation on Judicial Review," states:[301 U.S.App.D.C. 340] Except as otherwise provided in this subsection [§ 1821(d) ], no court shall have jurisdiction over--
 
 
 7
 (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver; or
 
 
 8
 (ii) any claim relating to any act or omission of such institution or the [FDIC] as receiver.
 
 
 9
 It would be plausible, though we need not decide the question here, to read § 1821(d)(13)(D)(ii)'s ouster of jurisdiction as limited to suits otherwise governed by the administrative claims regime set out in § 1821(d). See, e.g., Rosa v. Resolution Trust Corp., 938 F.2d 383, 395 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991). It would not be plausible, in light of § 1821(d)(13)(D), however, to read § 1821(j) as a bar only against circumvention of the statutory administrative claims procedures. Such a reading would make the latter provision largely redundant and would overlook Congress's casting of § 1821(j)'s directive in terms, not of precluding claims, but of shielding the FDIC's exercise of its "powers" and "functions."
 
 
 10
 The National Trust also argues that § 1821(j), which applies to the FDIC when acting "as a conservator or a receiver," is simply inapplicable because the FDIC is acting in its corporate capacity. The argument is precluded by 12 U.S.C. § 1823(d)(3)(A), which provides: "With respect to any asset acquired or liability assumed pursuant to this section, the Corporation shall have all of the rights, powers, privileges, and authorities of the Corporation as receiver under section[ ] 1821 ... of this title." The FDIC acquired the Dr. Pepper Building pursuant to its powers under § 1823; and the FDIC's immunity from judicial "restraint" is among its "rights, powers, privileges, and authorities" under § 1821.[2]
 
 
 11
 We do not suggest that § 1821(j) precludes courts from granting injunctive relief against the FDIC whenever and however it purports to act as a receiver. By its terms, § 1821(j) shields only "the exercise of powers or functions " Congress gave to the FDIC; the provision does not bar injunctive relief when the FDIC has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions. See Telematics Int'l, Inc. v. NEMLC Leasing Corp., 967 F.2d 703, 707 (1st Cir.1992); Rosa, 938 F.2d at 399; see also Coit Independence Joint Venture v. Federal Savings & Loan Ins. Corp., 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989). In liquidating assets it has obtained pursuant to 12 U.S.C. § 1823, however, the FDIC is acting squarely within its statutory "powers and functions," and surely not in conflict with any constitutional norm. We do not think it possible, in light of the strong language of § 1821(j), to interpret the FDIC's "powers" and "authorities" to include the limitation that those powers be subject to--and hence enjoinable for non-compliance with--any and all other federal laws. While Congress has included such provisos in some statutes immunizing agency action from outside second-guessing, see, e.g., 5 U.S.C. § 7106(a)(2) (management rights immunized from arbitral review under Federal Labor Relations Act only when exercised "in accordance with applicable laws"), we see no such limitation in § 1821(j).
 
 
 12
 In disposing of the assets of a bank, the FDIC is performing a routine "receivership" function that § 1821(j) unequivocally removes from judicial restraint. Deciding only the clear case before us, we do not reach further to consider whether § 1821(j) covers every other case a legal mind could conjure. Cf. Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962) (recognizing exception to Tax Anti-Injunction Act, 26 U.S.C. § 7421, where tax collector lacks "good faith" claim to tax sought to be collected). The Dr. Pepper [301 U.S.App.D.C. 341] Building came into the FDIC's hands only because the building was pledged as collateral on a loan extended by a federally insured financial institution; were it not for the fortuity of that institution's failure, the building would not be even arguably within the jurisdiction of a federal agency. If the contemplated sale to a private party goes through, the building will still be subject to state historic property preservation laws, see TEX. LOCAL GOV'T. CODE ANN. . § 315.006(b) (West 1993) (prohibiting unauthorized destruction of an "historic structure"), just as it would have if it had remained in private hands all along.[3]
 
 
 13
 The prohibition against restraining the FDIC, with its unambiguous "No court," applies as much to the courts of appeals as to the district courts. Having determined that § 1821(j) bars the National Trust's suit to enjoin the sale of the Dr. Pepper Building,[4] we deny the application for a stay, and affirm the district court's order dismissing the suit for lack of jurisdiction.
 
 WALD, Circuit Judge, dissenting:
 
 14
 Even if the majority should ultimately be proven right that 12 U.S.C. § 1821(j) deprives this court of jurisdiction to enjoin the sale and demolition of this historic building that has come under the FDIC's supervision, I believe it is singularly inappropriate to decide a first-time-in-the-circuit issue of such momentous consequences--potentially immunizing an agency from court enforcement of the entire U.S. Code--without the benefit of full briefing and oral argument. Accordingly, I dissent from the denial of the stay, which removes any federal law obstacles to the demolition of the Dr. Pepper Headquarters Building, considered one of the finest examples of Art Moderne architecture in Texas and already determined to be eligible for listing in the National Register of Historic Places.
 
 
 15
 I do not think the question of a court's jurisdiction to entertain any action against the FDIC, no matter what statute it is violating or in what statutorily authorized capacity it is acting, is as easily resolved as the majority's opinion suggests. While § 1821(j)'s language is unqualified in its breath-taking pronouncement that "no court may take any action," that bar must be read in the context of the statutory scheme as a whole. In South Carolina v. Regan, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984), for example, the Court limited the scope of equally expansive language in the Anti-Injunction Act, 26 U.S.C. § 7421(a),[1] based in part on its location within "a statutory scheme that provided an alternative remedy." Id. at 374, 104 S.Ct. at 1112. Despite the fact that the Act's language "could scarcely be more explicit," Bob Jones Univ. v. Simon, 416 U.S. 725, 736, 94 S.Ct. 2038, 2046, 40 L.Ed.2d 496 (1974), the Court concluded that "the Anti-Injunction Act's purpose and the circumstances of its enactment indicate that Congress did not intend the Act to apply to actions brought by aggrieved parties for whom it has not provided an alternative remedy." Regan, 465 U.S. at 378, 104 S.Ct. at 1114. Appellants argue here--certainly not frivolously--that § 1821(j) must similarly conform to a congressional intent to preclude judicial intervention only of claims that can be resolved by the statute's alternative administrative remedy.
 
 
 16
 The majority, however, disposes of this argument--and of the teachings of Regan--in a footnote explaining that this recent and seemingly applicable, if not controlling, Supreme Court precedent "can be fully comprehended only in light of Supreme Court doctrine" aimed at insulating the tax collector from suit. Majority opinion ("Maj. op.") at [301 U.S.App.D.C. 342] 239 n. 1. The panel's reading of Regan, however, reflects only its own comprehension, not the Court's. The Regan majority opinion included no language suggesting that the approach it employed--interpreting the anti-injunction provision in light of available indicia of congressional intent--was to be confined to tax cases or was in any way related to a tax collection doctrine. At best, a concurring opinion stated that the Act served this "collateral objective" of protecting the tax collector. Regan, 465 U.S. at 387, 104 S.Ct. at 1118-19 (O'Connor, J., concurring). Since Regan was, after all, a tax case, this passing reference to a tax doctrine seems wholly unremarkable, and certainly a slim reed to support the panel's contention that the Regan Court's rationale derived from and was limited to tax cases. To the contrary, the majority distinguished itself from the concurrence by noting its belief that Congress was concerned with providing, as well as limiting, remedies. Id. at 376 n. 13, 104 S.Ct. at 1113 n. 13. In any event, where the Supreme Court has indicated that courts may--if not must--inquire into and rely on indicia of congressional intent in interpreting an anti-injunction provision, I would have thought this court would feel compelled to at least engage in a full briefing and argument, before rejecting that prescribed approach out-of-hand in a footnote.[2]
 
 
 17
 Indeed, in construing the scope of § 1821(j) itself, our sister circuits, like the Regan Court, have taken pains to consider the availability of an alternative administrative remedy. The First Circuit, for example, stated:
 
 
 18
 Congress did not leave individuals having claims against the institution without a remedy, however. FIRREA [Financial Institutions Reform and Recovery Enforcement Act] contains an elaborate administrative system by which the FDIC may adjudicate claims against the insured institution.
 
 
 19
 Telematics Int'l, Inc. v. NEMLC Leasing Corp., 967 F.2d 703, 705 (1st Cir.1992) (citing 12 U.S.C.A. § 1821(d)(3)(ii) (West 1989 & Supp.1992)). While the Telematics court went on to conclude that the district court did, in fact, lack jurisdiction, its decision was based in part on "the elaborate structure created by FIRREA, and the evident intent of Congress that the structure should be permitted to stand with minimal court interference." Id.; see also United Liberty Life Insur. Co. v. Ryan, 985 F.2d 1320, 1329 (6th Cir.1992) (quoting Telematics); In re Landmark Land Co. of Oklahoma, Inc., 973 F.2d 283, 289 (4th Cir.1992) ("In FIRREA, Congress established a comprehensive statutory scheme within which the RTC could exercise its broad powers to reorganize and collect assets for the benefit of depositors (and taxpayers).").[3] Similarly, in construing another provision of FIRREA, the Third Circuit expressly concluded that "[w]hatever its breadth, we do not believe that clause (ii) [12 U.S.C. § 1821(d)(13)(D)(ii) ] encompasses claims that are not susceptible of resolution through the claims procedure." Rosa v. Resolution Trust Corp., 938 F.2d 383, 394 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991) (emphasis added). FIRREA, however, provides no administrative remedies for alleged violations of the National Historic Preservation Act ("NHPA"), or indeed of any other major regulatory statute, including worker safety or environmental protection statutes.
 
 
 20
 Again rejecting the approach counselled by the Regan Court, which interpreted the Anti-Injunction Act with regard to "indicia of [301 U.S.App.D.C. 343] congressional intent," Regan, 465 U.S. at 381, 104 S.Ct. at 1115, the majority notes that "[n]othing in the text of § 1821(j) limits its application," Maj. op. at 239, and referring to the "unambiguous" prohibition of that section, id. at 240-41, stops there, declining to look into the legislative history of FIRREA or the circumstances of its enactment. Appellants note, however, that the legislative history of FIRREA provides no hint of such an enormous role for the anti-injunction provision. See Reply to the Opposition to Emergency Motion for Stay Pending Appeal, at 6 & n. 9. The House Committee Report on FIRREA indicated that it was intended to bar court action only to the same extent as did the existing Home Owners' Loan Act ("HOLA"). H.R.REP. NO. 54, 101st Cong., 1st Sess. 334 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 130; see also Rosa, 938 F.2d at 395 (§ 1821(j) to have same effect as HOLA provision). The committee issued its draft of this legislation shortly after and presumably in light of the Supreme Court's decision in Coit Independence Joint Venture v. Federal Sav. & Loan Insur. Corp., 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989), in which it rejected an expansive interpretation of the HOLA anti-injunction provision. The record before us shows no congressional intent, reflected in the legislative history, to grant the FDIC virtually unprecedented authority to carry out its statutory responsibilities unchecked by any other federal laws and unfettered by any judicial intervention. Putting aside debates on the proper use of legislative history, this thundering silence on the part of Congress surely deserves at least a passing nod before authoritatively pronouncing circuit law on a stay motion. It is a true Sherlock Holmesian example of the dog that did not bark.
 
 
 21
 There are other reasons counselling a more in-depth inquiry than this stay motion has permitted. First, the majority's conclusion that, tucked away in the middle of FIRREA's detailed discussion of the FDIC's responsibilities in the valuation and distribution of assets and the conduct of liquidation proceedings, Congress bestowed upon the FDIC sweeping immunity from court intervention to enforce the entire body of federal regulatory law, presumably including criminal as well as civil prohibitions, " 'compel[s] an odd result,' " such as to take us out of the plain meaning rule. See Public Citizen v. Department of Justice, 491 U.S. 440, 454, 109 S.Ct. 2558, 2566, 105 L.Ed.2d 377 (1989) (quoting Green v. Bock Laundry Mach. Co., 490 U.S. 504, 509, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989)). Moreover, the Supreme Court has not generally limited its inquiry to a literal and unqualified reliance on the plain language of statutes limiting judicial review of administrative action. See, e.g., McNary v. Haitian Refugee Center, Inc., 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) (giving narrowing construction to broadly worded statutory bar of judicial review of amnesty applications under the Immigration Reform and Control Act of 1986); Traynor v. Turnage, 485 U.S. 535, 108 S.Ct. 1372, 99 L.Ed.2d 618 (1988) (concluding that a provision barring judicial review of "the decision of the [Veterans' Administration] Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits for veterans," 38 U.S.C. § 211(a), did not preclude judicial review of a claim that the VA's denial of certain benefits to recovering alcoholics violated § 504 of the Rehabilitation Act of 1973). A careful examination of the circumstances surrounding the adoption of FIRREA might indeed yield " 'clear and convincing evidence,' " Abbott Labs. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1512, 18 L.Ed.2d 681 (1967) (internal citations omitted), sufficient to overcome "the strong presumption that Congress intends judicial review of administrative action," Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670, 106 S.Ct. 2133, 2136, 90 L.Ed.2d 623 (1986), but our hurried consideration of this stay motion precluded any such examination.
 
 
 22
 Despite the majority's reassurance that it is "deciding only the clear case before us," Maj. op. at 240-41, that cannot be so. The implications of its basic approach and its holding cannot be so easily cabined. It has declined to inquire into any indicia of congressional intent that might limit the sweep of § 1821(j)'s broad prohibition, and it has declined to interpret the statute to make the FDIC's exercise of its functions generally [301 U.S.App.D.C. 344] subject to other federal laws. See Maj. op. at 240-41. How then can we read its "plain meaning" rationale other than to preclude virtually any other case "a legal mind could conjure"? Maj. op. at 240-41.[4] The majority cannot have it both ways. By this decision, the majority does effectively insulate the FDIC from judicial intervention even in the face of allegations of egregious violations of federal law threatening grave and irreparable harm. Suppose, for example, that the FDIC, acting in its receiver capacity, were operating a factory or even a hazardous waste facility in a manner that was causing serious health or environmental damage and that allegedly violated the Clean Water Act or the Occupational Safety and Health Act. The majority's approach would effectively hold the court powerless to take "any action ... to restrain or affect" that operation, unless the FDIC "has acted or proposes to act beyond, or contrary to, its statutorily prescribed, constitutionally permitted powers or functions." Maj. op. at 240. This case, however, raises the question--again hardly a frivolous one--whether the freedom to wholly disregard the NHPA, a duly enacted law applicable to all other federal agencies, is indeed a statutorily granted receiver power, so that the FDIC may violate that law, without acting outside the scope of its powers.
 
 
 23
 I do not mean to suggest that appellants do not face significant hurdles in their argument for jurisdiction. In Rosa, for example, the Third Circuit held that the district court lacked jurisdiction over a request for an injunction prohibiting the RTC, in its role as conservator, from terminating a pension plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), or requiring it to make payments to the plan's trustees. Read broadly, Rosa could be taken to preclude jurisdiction over injunctions alleging violations of federal laws not directly related to the resolution of creditors' claims under FIRREA. A tighter reading of Rosa, however, reveals certain distinctions. First, the Rosa court expressly reserved ruling on possible exceptions to § 1821(j), such as those based on the absence of an alternative remedy, Rosa, 938 F.2d at 400, an argument not put forward there but squarely presented here. Second, the Rosa court expressly concluded that the anti-injunction provision did not bar claims against the RTC in its corporate capacity. Id. at 393. Briefing and argument could shed light on the proper reading of Rosa and the right resolution of these questions.
 
 
 24
 This action was brought not by a disappointed claimant, but by, among others, the National Trust for Historic Preservation in the United States, the primary congressionally-authorized protector of the nation's significant historical properties. Before the preliminary injunction was denied in a conclusory one-paragraph order, a different district court had already concluded that the National Trust had "established absolute irreparable harm" and had shown that it "m[ight] well prevail" on the merits, and that a temporary restraint would not cause serious harm to the appellee and would be in the public interest. National Trust for Historic Preservation v. FDIC, No. 93-0904-HHG, 1993 WL 328134 (D.D.C. May 7, 1993), slip op. at 7. Given the high stakes here, both in this and in future cases, I would, at a minimum, follow the lead of our sister circuits and allow this question to be decided in a more comprehensive, albeit expedited, fashion with regular briefing and argument, instead of making binding circuit precedent in barely over a week on an unargued stay motion.
 
 
 
 [1]
 We recognize that in South Carolina v. Regan, 465 U.S. 367, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984), the Supreme Court read into the encompassing language of the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a), an exception allowing states to invoke the Court's original jurisdiction to test the constitutionality of a provision of the Tax Equity and Fiscal Responsibility Act of 1982. The Court rested its decision on the "Act's purpose and the circumstances of its enactment," which indicated that "Congress did not intend the Act to apply to actions brought by aggrieved parties for whom it has not provided an alternative remedy." 465 U.S. at 378, 104 S.Ct. at 1114. In addition to its unique context, the decision can be fully comprehended only in light of Supreme Court doctrine that otherwise insulates the tax collector against suits that would deflect the collector's energies from the collection of taxes. See, e.g., Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)
 The South Carolina v. Regan decision does not stand for the proposition that whenever a statute bars injunctive relief, the courts are to ignore the statutory restriction if the plaintiff cannot obtain adequate judicial relief by some other method. Injunctions generally issue when the alternative of a remedy at law is inadequate; preliminary injunctions and stays issue in order to prevent irreparable harm. To hold that the lack of an adequate alternative remedy renders § 1821(j)'s bar against restraining orders inoperative would therefore be tantamount to rendering the provision entirely ineffective.
 
 
 [2]
 In Rosa v. Resolution Trust Corp., 938 F.2d 383, 395 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991), which stated that § 1821(j) does not apply to the Resolution Trust Corporation (RTC) in its corporate capacity, RTC invoked neither § 1823(d)(3)(A) nor any comparable provision equating corporate action, in the particular setting, to that of a receiver
 
 
 [3]
 This result is hardly so untoward that one might doubt whether the statute reaches so far. Cf. South Carolina v. Regan, 465 U.S. at 398-402, 104 S.Ct. at 1124-1127 (O'Connor, J., concurring in the judgment)
 
 
 [4]
 We have considered, in reaching this judgment, the ample written submissions of the parties on the motion to stay before this court and the full presentations before the district court on the motions for a temporary restraining order and a preliminary injunction
 
 
 [1]
 That Act provides, in relevant part, that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 4721(a)
 
 
 [2]
 I agree with the majority, see Maj. op. at 239 n. 1, that Regan does not stand for the proposition that an anti-injunction provision can never be applied in the absence of an alternative remedy, whether judicial or administrative. I do read Regan to suggest that an anti-injunction provision should not be interpreted in the absence of a considered inquiry--or indeed, any inquiry--into the reach Congress intended to give the provision. If the inquiry reveals no congressional concern for the availability of alternative remedies, then clearly the court should not impose such a limitation. My reluctance is to reach that conclusion without adequate consideration of "the circumstances of [the provision's] enactment." See Regan, 465 U.S. at 378, 104 S.Ct. at 1114
 
 
 [3]
 Both the FDIC and the RTC are subject to § 1821(j), and case law applying that provision to one agency is applicable to the other. See, e.g., In re Colonial Realty, 980 F.2d 125, 136 (2d Cir.1992) (applying RTC precedent in case involving FDIC)
 
 
 [4]
 Nor does the majority negate the broad implications of its ruling by its passing reference to Enochs v. Williams Packing & Navigation Co., 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962). Enochs held that a taxpayer could seek to enjoin the collection of a tax only where the government had no chance, under any circumstances, of prevailing on its claim, such that its action would be an "exaction" in "the guise of a tax." Id. (internal citation omitted). So limited a remedy provides no relief in situations like this one, where two different district court judges have determined that the party seeking an injunction has made a strong showing on the merits. National Trust for Historic Preservation v. FDIC, No. 93-0904-HHG, 1993 WL 328134 (D.D.C. May 7, 1993), slip op. at 7 (Trust had "established absolute irreparable harm" and had shown that it "m[ight] well prevail" on the merits); id., 1993 WL 211773 (D.D.C. May 14, 1993) (agreeing that the Trust had made a "strong showing on the merits")